1 | **BOIES SCHILLER FLEXNER LLP**
K. LUAN TRAN (SBN 193808)
2 | 725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
3 | Telephone:  (213) 629-9040
Facsimile:  (213) 629-9022
4 | ltran@bsfllp.com

5 | MAXWELL V. PRITT (SBN 253155)
1999 Harrison Street, Suite 900
6 | Oakland, CA 94612
Telephone:  (510) 874-1000
7 | Facsimile:   (510) 874-1460
mpritt@bsfllp.com

8 | Attorneys for IRA KLEIMAN, as Personal
9 | Representative of the Estate of David Kleiman,
and W&K INFO DEFENSE RESEARCH, LLC

10 |

11 | **UNITED STATES DISTRICT COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA**

13 | **WESTERN DIVISION**

14 |

15 | IN RE SUBPOENA TO JOSEPH VAUGHN PERLING | Misc. Case No. 2:19-mc-00083

16 | | Underlying Litigation:
Case No. 9:18-cv-80176-BB
17 | IRA KLEIMAN, as the personal representative of the Estate of David | United States District Court
Southern District of Florida
18 | Kleiman, and W&K Info Defense Research, LLC, | **[DISCOVERY MATTER]**

19 |                 Plaintiffs, | **DECLARATION OF MAXWELL V. PRITT IN SUPPORT OF MOTION TO**

20 |         v. | **COMPEL COMPLIANCE WITH SUBPOENA**

21 | CRAIG WRIGHT, |

22 |                 Defendant. |

23 |

24 |

25 |

26 |

27 |

28 |

DECLARATION OF MAXWELL V. PRITT

I, Maxwell V. Pritt, declare as follows:

1.      I am a partner at the law firm of Boies Schiller Flexner LLP, representing movants Ira Kleiman, as Personal Representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC ("Movants"). I have personal knowledge of the matters set forth in this declaration, or am informed and believe them to be true, and if called upon as a witness could and would testify competently to the matters herein.

2.      I respectfully submit this declaration in support of Movants' Motion to Compel Compliance With Subpoena and Memorandum of Points and Authorities in Support.

3.      Attached as **Exhibit 1** is a true and correct copy of the subpoena issued by the United States District Court for the Southern District of Florida on February 25, 2019 to Joseph Vaughn Perling in connection with the case *Kleiman v. Wright*, No. 9:18-cv-80176 (S.D. Fla.) (the "Subpoena").

4.      Attached as **Exhibit 2** is a true and correct copy of the Second Amended Complaint filed in the United States District Court for the Southern District of Florida against Craig Wright, *Kleiman v. Wright*, No. 9:18-cv-80176-BB (S.D. Fla. Jan. 14, 2019), ECF No. 83.

5.      Attached as **Exhibit 3** is a true and correct copy of the Order On Motion To Dismiss, filed in the United States District Court for the Southern District of Florida, *Kleiman v. Wright*, No. 9:18-cv-80176-BB (S.D. Fla. Dec. 27, 2018), ECF No. 68.

6.      Attached as **Exhibit 4** is a true and correct copy of the Affidavit of Service for the Subpoena.

7.      Attached as **Exhibit 5** is a true and correct copy of a May 23, 2019 letter to Mr. Vaughn Perling requesting that he (or any counsel he may have retained) respond to the Subpoena by June 3, 2019.

8.      Attached as **Exhibit 6** is a true and correct copy of the Certified Mail Receipt dated May 23, 2019.

///

///

DECLARATION OF MAXWELL V. PRITT

1       I declare under penalty of perjury under the laws of the United States of America that

2 the foregoing is true and correct. Executed on this 5th day of June, 2019, in Oakland,

3 California.

4

5                  */s/ Maxwell V. Pritt*
                 Maxwell V. Pritt

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MAXWELL V. PRITT

# EXHIBIT 1

EXHIBIT 1
PAGE 3

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
Southern District of Florida

| | |
|---|---|
| Ira Kleiman et al. | ) |
| _Plaintiff_ | ) |
| v. | )   Civil Action No.   9:18-cv-80176 |
| Craig Wright | ) |
| | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:              Joeseph VaughnPerling
        4908 CALLE ROBLEDA, AGOURA HILLS, CA
_____
_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:  Schedule A

| Place: Boies Schiller Flexner LLP, 725 S<br>Figueroa St, Los Angeles, CA 90017 | Date and Time:<br><br>03/27/2019 10:00 am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     02/25/2019

        CLERK OF COURT
                                            OR
                                                    /s/ Kyle W. Roche
_____        _____
_Signature of Clerk or Deputy Clerk_              _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_   Ira Kleiman, as the
p.r. of the estate of Dave Kleiman and W&K Info Defense Research     , who issues or requests this subpoena, are:

Kyle W. Roche, 333 Main Street, Armonk, NY 10504; kroche@bsfllp.com; 914-749-8324

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT 1
PAGE 4

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  9:18-cv-80176

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____.

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

EXHIBIT 1
PAGE 4

| Print | Save As... | Add Attachment | | Reset |

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT 1
PAGE 6

# SCHEDULE A

EXHIBIT 1
PAGE 7

## UNITED STATES DISTRICT COURT
## SOUTHERN DISRICT OF FLORIDA

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC | Case No.  9:18-cv-80176-BB |
| | The Honorable Beth Bloom |
| Plaintiffs, | The Honorable Bruce E. Reinhart |
| v. | **PLAINTIFFS' SUBPOENA FOR JOSEPH VAUGHNPERLING** |
| CRAIG WRIGHT | |
| Defendant | |

YOU ARE HEREBY COMMANDED, pursuant to Fed. R. Civ. P. 45, to produce the documents and things designated herein for inspection at Boies Schiller Flexner LLP, 725 S Figueroa St, Los Angeles, CA 90017, or such other place as is mutually agreed upon between You and counsel for Plaintiffs, within 30 days of service, as provided under the Federal Rules of Civil Procedure.  This subpoena for documents, including each individual Request for Documents (collectively, the "Requests"), shall be read and interpreted in accordance with the definitions and instructions identified below.

## DEFINITIONS AND INSTRUCTIONS

Plaintiffs incorporate by reference all the instructions, definitions, and rules contained in the Federal Rules of Civil Procedure, and for purposes of this Subpoena, the following instructions and definitions shall apply:

1.      The singular of each word shall be construed to include its plural and vice-versa, and the root word and all derivations (*e.g.*, "ing," "ed") shall be construed to include each other. The words "and" as well as "or" shall be construed both conjunctively and disjunctively.

2.       If the requested documents are maintained in a file, the file folder is included in the request for production of those documents.

EXHIBIT 1
PAGE 8

3.      The term "Craig Wright" and/or "Defendant" shall mean Defendant Craig Wright and any Person or Trust (as defined herein) of which (a) Craig Wright is an owner, shareholder, member, manager, director, officer, trustee, employee, or beneficiary of ("CSW Persons/Trusts"), or that (b) is controlled by Craig Wright or any CSW Persons/Trusts.

4.      "Person" or "persons" shall mean each and every individual, corporation, partnership, joint venture, social or political organization, or any other entity, incorporated or unincorporated, or encompassed within the usual and customary meaning of "person" or "persons."

5.      The term "trust" shall include any arrangement, entity, vehicle, agreement, deed, or relationship, in any jurisdiction, where the person with title or control over property has duties to deal with it for another's benefit. Due to variances in various jurisdictions' laws, this definition should not be given an overly formalistic construction, but a liberal one. It should include any arrangement bearing a similarity to a "trust," and any such arrangement you (or others) have actually referred to as a "trust."

6.      The term "concerning" means "relating to," "referring to," "describing," "evidencing" or "constituting."

7.      The terms "document" or "documents" shall mean any written, typewritten, handwritten, printed, graphic, photographic, electronic or recorded materials, including, but not limited to the following: correspondence and drafts of correspondence; e-mails; SMS messages; Whatsapp messages; Signal messages; Twitter DMs; Facebook messages; any other form of messages or communications; notes or summaries of conversations; forms; schedules or worksheets; memoranda; reports; comments; worksheets; plans; minutes; notes; notices or notifications; findings; brochures; circulars; bulletins; advertisements; records; summaries or

other reports of conferences, meetings, visits, surveys, discussions, inspections, and examinations; journals; logs; ledgers; balance sheets; profit and loss statements; purchase orders; quotations; estimates; invoices; bids; receipts; pledge commitments; acknowledgments; credit memoranda; contract or lease offers or proposals; income tax returns; check stubs (front and back); sales vouchers or records; executed or proposed agreements; contracts; deeds; franchise agreements; licenses; leases; insurance policies and riders or options; proposals; diaries; desk calendars; appointment books; evaluations; applications; telephone call books, notes or records; affidavits, deposition transcripts, statements or summaries or excerpts thereof; stenographic notes; financial data; newspaper or magazine articles; pamphlets; books; texts; notebooks; magazines; manuals; publications; notepads; tabulations; data compilations; calculations; or computations; schedules; drafts; charts and maps; forecasts and projections; feasibility studies; drawings, designs, plans, specifications; graphs, blueprints, sketches, or diagrams; printouts or other stored information from computers or other information retention or processing systems; hard drives, USB drives, disks, CD's, DVD's, tapes, videotapes; photographic matter or sound reproduction matter however produced, reproduced or stored; computer data of any kind whatsoever; any exhibits, attachments, or schedules to or with the foregoing; any drafts of the foregoing; any of the foregoing that exist in a form by which they are protected by computer encryption; any copies or duplicates of the foregoing that are different because of marginal or handwritten notations, or because of any markings thereon; the inclusion of specific examples within any individual request does not limit the definition provided herein and should be viewed as merely as examples meant to facilitate production.

      8.    "Copy" when used in reference to a document means any color, or black and white facsimile reproduction of a document, regardless of whether that facsimile reproduction is

made by means of carbon papers, pressure sensitive paper, xerography or any other means of process.

9.      "Communication" and "communicate" shall mean any recordation, exchange or transfer of information, whether in writing, audio, oral or other form, including, but not limited to, memoranda or notes, telephone conversations and meetings, letters, telegraphic and telex communications, email communications, SMS messages, Twitter DMs, Facebook messages, Whatsapp messages, Signal messages, any other form of messages or communications, blogs, voicemails, and includes all information relating to all oral or written communications and "documents" (as herein above defined), whether or not such document, or information contained herein was transmitted by its author to any other person; the inclusion of specific examples within any individual request does not limit the definition provided herein and should be viewed as merely as examples meant to facilitate production.

10.     A draft of a non-identical copy is considered a separate document.

11.     The terms "electronically stored information" and "ESI" are defined to be synonymous in meaning and equal in scope to the usage of "electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).   "ESI" includes data on all servers, including IP addresses, MAC addresses, active data, archived data, deleted data, and legacy data, as well as data on removable electronic media and in any other location where documents relevant to the Requests may be found.

12.     "Person" or "persons" shall mean each and every individual, corporation, partnership, joint venture, social or political organization, or any other entity, incorporated or unincorporated, or encompassed within the usual and customary meaning of "person" or "persons."

13.     "Agent" shall mean: any agent, employee, officer, director, attorney, independent contractor or any other person acting at the direction of or on the behalf of another.

14.     "Date" shall mean the exact day, month and year if ascertainable or, if not, the best approximation, including relationship to other events.

15.     The term "materials" shall mean (1) the elements, constituents, or substances of which something is composed or can be made; something (as data) that may be worked into a more finished form (2) apparatus necessary for doing or making something; (3) The substance or substances out of which a thing is or can be made; and/or (4) Tools or apparatus for the performance of a given task.

16.     The terms "You" and "Your" shall mean and refer to Joseph VaughnPerling.

17.     The term "including" shall be construed as "including, but not limited to."

18.     When referring to a person, "to identify" means to give, to the extent known, the person's full name and present or last known address.

19.     The term "cryptocurrency" shall mean any digital currency in which encryption techniques are used to regulate the generation of units of currency and verify the transfer of funds, operating independently of a central bank. It shall include, but not be limited to, Bitcoin, Bitcoin Cash, any other "forked" Bitcoin asset, and Ethereum's Ethers.

20.     The term "trust" shall include any arrangement, entity, vehicle, agreement, deed, or relationship, in any jurisdiction, where the person with title or control over property has duties to deal with it for another's benefit. Due to variances in various jurisdictions' laws, this definition should not be given an overly formulistic construction, but a liberal one. It should include any arrangement bearing a similarity to a "trust," and any such arrangement you (or others) have actually referred to as a "trust."

21.     The term "Satoshi Nakamoto" shall refer to anyone, or group of people, going by the name, username, pseudonym, or moniker of Satoshi Nakamoto or any part of reference to that name; this includes, but is not limited to, any communications to or from the following email accounts: satoshin@gmx.com, satoshi@vistomail.com, and satoshi@anonymousspeech.com.

22.     Any reference to a person that is a business entity and is not otherwise defined includes that person's predecessors (including any pre-existing person that at any time became part of that entity after merger or acquisition), successors, parents, divisions, subsidiaries, affiliates, franchisors and franchisees; each other person, directly or indirectly owned or controlled by any of them; each partnership or joint venture to which any of them is a party; all present and former directors, officers, employees, agents, consultants, controlling shareholders (and any entity owned by any such controlling shareholder), and attorneys of any of them; and any other person acting for or on behalf of any of them.

23.     Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition, except where such words have a usual custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware.

24.     Pursuant to Rule 45(e)(1)(a) of the Federal Rules of Civil Procedure, documents shall be produced either (a) as they are kept in the usual course of business (in which case they shall be produced in such fashion as to identify the department, branch or office in whose possession it was located and, where applicable, the natural person in whose possession it was found or the server or central file in which it was found, and the address of each document's custodian(s)), or (b) segregated as responsive to a specific Request enumerated in these Requests, with such specific Request identified.

25.     If you file a timely objection to any portion of a Request, definition, or instruction, provide a response to the remaining portion.

26.     The relevant period for these requests is January 1, 2006 to the time of the response to this subpoena. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to any of the Requests.

27.     The terms defined above and used in each of the Requests should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules of Civil Procedure.

## DOCUMENTS TO BE PRODUCED

**REQUEST 1.**    All documents and communications related to your involvement with the October 30, 2015 Las Vegas Bitcoin panel. (See https://www.youtube.com/watch?v=LdvQTwjVmrE).

**REQUEST 2.**    All documents, agreements, and communications related to, or with, Craig Wright, or any company, trust, account, or fund he had/has a relationship with or ownership interest in.

**REQUEST 3.**    All documents, agreements, and communications related to, or with, David Kleiman, or any company, trust, account, or fund he had/has a relationship with or ownership interest in.

**REQUEST 4.**    All documents, agreements, and communications relating to, or with, W&K Info Defense Research, LLC.

**REQUEST 5.**    All documents, agreements, and communications relating to, or with, Uyen Nguyen; this includes, but is not limited to, any communications to or from the following email accounts: ut.ng@hotwirepe.com; thucuyen279@gmail.com, and uyen.nguyent@yahoo.com.

**REQUEST 6.**    All documents, agreements, and communications relating to, or with, anyone going by the name, username, pseudonym, or moniker of Satoshi Nakamoto; this includes, but is not limited to, any communications to or from the following email accounts: satoshin@gmx.com, satoshi@vistomail.com, and satoshi@anonymousspeech.com.

**REQUEST 7.**    All documents, communications, and agreements that relate in any way to a "Tulip Trust" or "GISCR Trust."

**REQUEST 8.**    All documents, communications, and agreements that relate to any of the following entities: DeMorgan Ltd, Coin-Exch Pty. Ltd, Hotwire Preemptive Intelligence Pty

Ltd, Cloudcroft Pty Ltd, Craig Wright R&D, W&K Information Defense Research LLC, any Person with "W&K" in its name, Wright Family Trust, Design by Human Ltd., Panopticrypt Pty Ltd, Denariuz SG, Tulip Trading Ltd., Permanent Success Limited, Integyrs, and the Global Institute for Cybersecurity and Research ("GISCR").

**REQUEST 9.**    All documents, agreements, and communications concerning the mining of bitcoins between January 1, 2009 and April, 2013.

**REQUEST 10.**    All documents, communications, and agreements concerning any in-person meeting involving you and and at least one of either Craig Wright, Uyen Nguyen, Ramona Watts, Lynn Wright, or David Kleiman.

**REQUEST 11.**    All documents, agreements, and communications concerning Bitcoin wallets believed to be owned and / or under the control of Satoshi Nakamoto.

**REQUEST 12.**    All documents and communications concerning the identity of Satoshi Nakamoto.

**REQUEST 13.**    All documents, communications, and agreements that relate to Silk Road.

**REQUEST 14.**    All documents, communications, and agreements that relate to Liberty Reserve.

**REQUEST 15.**    All documents, communications, and agreements that relate to Mt. Gox.

**REQUEST 16.**    All documents communications and agreements that relate to the Prometheus Project.

**REQUEST 17.**    All documents, agreements, and communications related to, or with, Michele Seven (a/k/a Bitcoinbelle).

**REQUEST 18.**    All communications with Ian Grigg (whether with you or third party/parties).

**REQUEST 19.**    All communications with Richard Zaluski (whether with you or third party/parties).

**REQUEST 20.**    All communications with Deborah Kobzah (whether with you or third party/parties).

**REQUEST 21.**    All communications with Andrew O'Hagan dated between October 2015 to the present.

**REQUEST 22.**    All communications with Robert MacGregor dated between October 2015 to the present.

**REQUEST 23.**    All communications with Stefan Matthews dated between October 2015 to the present

**REQUEST 24.**    All communications with Calvin Ayre dated between October 2015 to the present

**REQUEST 25.**    All communications with Roger Ver dated between October 2015 to the present

**REQUEST 26.**    All communications with John Matonis dated between October 2015 to the present.

**REQUEST 27.**    All communications with Ed Moy dated between October 2015 to the present.

**REQUEST 28.**    All communications with Trace Mayer dated between October 2015 to the present.

**REQUEST 29.**    All communications with Nick Szabo dated between October 2015 to the present.

Dated February 25, 2019                    Respectfully submitted,

                                           *s/ Velvel (Devin) Freedman*
                                           Velvel (Devin) Freedman, Esq.
                                           BOIES SCHILLER FLEXNER LLP
                                           100 SE Second Street, Suite 2800
                                           Miami, Florida  33131
                                           Telephone:  (305) 539-8400
                                           Facsimile:   (305) 539-1307
                                           vfreedman@bsfllp.com

                                           Kyle W. Roche, Esq.
                                           *Admitted Pro Hac Vice*
                                           BOIES SCHILLER FLEXNER LLP
                                           333 Main Street
                                           Armonk, NY 10504
                                           Telephone: (914) 749-8200
                                           Facsimile:  (914) 749-8300
                                           kroche@bsfllp.com

                                           *Counsel to Plaintiffs Ira Kleiman as Personal*
                                           *Representative of the Estate of David Kleiman and*
                                           *W&K Info Defense Research, LLC.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 25, 2019, a true and correct copy of the foregoing was served on all counsel of record via email.

                                           */s/ Velvel (Devin) Freedman*
                                           Velvel (Devin) Freedman

# EXHIBIT 2

EXHIBIT 2
PAGE 19

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC

       Plaintiffs,

v.

CRAIG WRIGHT

       Defendant.

**CASE NO.: 9:18-cv-80176-BB**

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.    (305)539-8400
Fax.    (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche (*admitted pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.    (914)749-8200
Fax.    (914)749-8300
Email: kroche@bsfllp.com

**ATTORNEYS FOR PLAINTIFFS**

EXHIBIT 2
PAGE 20

## SECOND AMENDED COMPLAINT

Plaintiff Ira Kleiman, as personal representative of David Kleiman's estate ("Ira"), and Plaintiff W&K Info Defense Research, LLC ("W&K") hereby sue Defendant Craig Steven Wright ("Craig") and state as follows:

### PARTIES

1.       Plaintiff Ira Kleiman, as personal representative, is a resident of Palm Beach County, Florida.  He is David Kleiman's ("Dave") brother and the personal representative of his estate ("the estate").

2.       Plaintiff W&K Info Defense Research, LLC is a Florida limited liability company incorporated in 2011.  During the times relevant to this Second Amended Complaint, W&K operated in Florida.  This entity is one vehicle through which Defendant and Dave mined hundreds of thousands of bitcoins and created valuable blockchain intellectual property.

3.       Defendant Craig Steven Wright is a resident of London, United Kingdom.  He is Dave's former business partner in W&K and otherwise.

### JURISDICTION AND VENUE

4.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000; this Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because Plaintiffs' Defense of Trade Secrets Act claim arises under the laws of the United States.

5.       Venue lies within this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District.  These events include, but are not limited to: the wrongful taking of property belonging to a Florida estate and/or LLC within this District; the partnership of Dave and Craig within this District; the operation of W&K by Dave

2

EXHIBIT 2
PAGE 21

and Craig within this District; the mining of a substantial amount of bitcoins through the use of computer equipment located within this District and/or by equipment owned and/or operated by a Florida resident (Dave) or Florida LLC (W&K); the development of certain blockchain related intellectual property within this District; and the commission of a fraud against an estate in this District.

6.       This Court has personal jurisdiction over Craig pursuant to Fla. Stat. § 48.193 as he operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within this state; and caused injury to persons and property within this state at or about the time he was engaged in solicitation and service activities within this state.

## **INTRODUCTION**

7.       This matter concerns the rightful ownership of hundreds of thousands of bitcoins[1] and the valuable intellectual property rights of various blockchain technologies. As of the date of the Amended Complaint filing, the value of these assets far exceed $11,427,755,048.02 USD (before punitive or treble damages); at their highest value they were worth over $27,332,125,781.93.  Plaintiffs allege Defendant has stolen these bitcoins and intellectual property assets from them.

8.       After Ira filed this claim, Craig committed a fraud on this Court in an attempt to circumvent its jurisdiction. As detailed in paragraphs 160 to 170 Craig filed a sworn declaration that is incontrovertibly false based on an affidavit (and supporting evidence) he previously submitted to an Australian court. The boldfaced misrepresentations Craig has told this Court demonstrate his desperation to avoid this suit.

---

[1] The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoin" to label the units of exchange.

EXHIBIT 2
PAGE 22

9.      Bitcoin is the world's first decentralized cryptocurrency.  The concept and technology behind Bitcoin was first published in October 2008 when its pseudonymous creator, Satoshi Nakamoto, sent the now famous protocol to a mailing list of cryptography enthusiasts. That protocol has since spawned a system of value and exchange with a current market cap of ~$150 billion.

10.      Based on information Ira Kleiman received directly from Dave, it is undeniable that Craig and Dave were involved in Bitcoin from its inception and, together, had accumulated a vast wealth of bitcoins from 2009 through 2013.

11.      On April 26, 2013, mere months prior to Bitcoin's entry into the mainstream, Dave died after a battle with MRSA.

12.      Recognizing Dave's family and friends weren't aware of the extent of Dave's Bitcoin and blockchain related activities, Craig perpetrated a scheme against Plaintiffs to seize their bitcoins and their rights to certain blockchain related intellectual property.

13.      As part of this plan, Craig took control of Plaintiffs' bitcoins and forged a series of contracts that purported to transfer Plaintiffs' bitcoins and intellectual property assets to Craig and/or companies controlled by him.  Craig backdated these contracts and forged Dave's signature on them.

14.      About a year after Dave's death, and under pressure from an Australian Tax Office investigation, Craig reached out to Ira, Dave's brother.  Craig disclosed he had partnered with Dave to create Bitcoin, mine bitcoin, and create valuable intellectual property.  But, he claimed Dave signed all these property rights away in exchange for a non-controlling share of a non-operational Australian company worth "millions."

15. Craig told Ira he'd be able to sell Dave's stake in the company in a few months. This was a lie in several respects. First, Dave had not in fact traded his bitcoin and intellectual property rights for an interest in the Australian company. Second, the company went bankrupt shortly after Craig misled the Australian Tax Office ("ATO").

16. The ATO raided Craig's home in late 2015 and Craig fled Australia for London. Since fleeing to London, Craig has lived a life of fame and fortune. In May 2016, he publicly revealed himself and Dave as the alleged creators of Bitcoin.

17. Craig currently serves as Chief Scientist of nChain, a UK company purporting to be the global leader in research and development of blockchain technologies. He also regularly posts pictures to his social media accounts of his lavish lifestyle.

18. To date, Craig has not returned any of the mined bitcoins or intellectual property rights belonging to Plaintiffs. This action is brought to rectify that injustice.

19. As described in detail below, Craig's pattern of lies, deception, and fraudulent conduct continues even against this Court. His fraud on this Court is simply the latest step taken in Florida to defraud the estate and W&K.

## FACTUAL ALLEGATIONS

### Bitcoin

20. Bitcoin is a decentralized digital currency with a current market cap of ~$150 billion as of March 14, 2018.[2] At its core, Bitcoin is simply a giant ledger that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the bitcoin blockchain.

21. In order to transact with bitcoins, you must have a bitcoin wallet. Like a bank account number, each bitcoin wallet has a "public key" that is the "address" provided if one would

---

[2] https://coinmarketcap.com/.

5

EXHIBIT 2
PAGE 24

like to receive bitcoin from others. Every wallet can be identified on the blockchain (by referring to its "public key") along with the number of bitcoins inside that particular wallet. Wallets are separate computer files dedicated to storing information about specific bitcoins.

22.    Each wallet is also assigned a "private key." Unlike public keys, private keys are only known by the individual who creates the bitcoin wallet. The private key is like the "password" to the wallet. To send bitcoin out of a wallet, an individual must have the private key associated with the bitcoin wallet. This is similar to the manner in which one must have a PIN to withdraw cash from an ATM.

23.    There are two methods of acquiring bitcoins. The first involves simply receiving bitcoins from someone. In fact, there are many businesses that operate "bitcoin exchanges," such as coinbase.com, which is a bitcoin marketplace where individuals can purchase bitcoins with their native currency from individuals looking to sell.

24.    The second way one can acquire bitcoins is by "mining" them.

25.    There is no centralized authority that curates the Bitcoin blockchain. Consequently, the protocol has to incentivize individuals to curate the blockchain, i.e., to update the "ledger" with new transactions as they take place. This process is called "bitcoin mining."

26.    Anyone with internet access can "mine bitcoins" by employing computer power to solve a complex mathematical problem. The first "miner" who solves the problem gets the right to add a block of recent transactions to the blockchain, i.e., the right to update the ledger. In return for this work, the protocol pays the successful miner in newly minted bitcoins (the number of which is fixed by a pre-existing algorithm). This process is repeated every 10 minutes or so, ensuring an accurate and up to date record of all bitcoin transactions.

6

EXHIBIT 2
PAGE 25

27.     When the Bitcoin protocol was first launched in January 2009, the protocol paid the successful miner 50 bitcoins for each block of transactions added to the blockchain ledger. The protocol cuts this mining reward in half every four years so that the maximum amount of bitcoin in existence will never exceed 21 million. At the current mining rate and reward algorithm, this maximum circulation will be reached in circa 2140.

28.     Today, the mining reward is 12.5 bitcoins for each block added to the blockchain. That, together with rising competition in mining bitcoins means it was easier to amass significant amounts of bitcoins in 2009, than now.

29.     To date, just over 17 million of the total 21 million bitcoins have been mined.

### History of Bitcoin

30.     On October 31, 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto ("Satoshi") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts. This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."

31.     Less than three months later, the system outlined became a reality. On January 3, 2009, Satoshi mined the first 50 bitcoins. To place a timestamp on the occasion, Satoshi left a text message digitally encoded on these first 50 bitcoins that read, "The Times 3 January 2009 Chancellor on brink of second bailout for banks," referring to that day's headline in the British newspaper, *The Times*.

32.     Hal Finney, one of the first supporters and adopters of Bitcoin, downloaded the bitcoin software that same day, and received 10 bitcoins from Satoshi in the world's first bitcoin transaction.

7

EXHIBIT 2
PAGE 26

33.     Satoshi also created a website under the domain name bitcoin.org and continued to collaborate with other developers on the Bitcoin protocol until mid-2010.  Around this time, he handed control of the Bitcoin source code repository to Gavin Andresen, another active member of the bitcoin development community, and disappeared.  The last confirmed email from Satoshi was sent on April 23, 2011.  It read, "I've moved on to other things. It's in good hands with Gavin and everyone."

34.     For most of its early history, bitcoins were of relatively little value.  Famously, the first documented commercial bitcoin transaction occurred when developer Laszlo Hanyecz used 10,000 bitcoins to purchase two Domino's pizzas on May 22, 2010.  At today's prices, those two pizzas would be worth approximately 1% of Domino's total market cap.

35.     During Bitcoin's early history, cryptocurrencies were a niche technology with a small development community. Consequently, there was little competition for maintaining the ledger or "mining bitcoins." Thus, individuals mining bitcoins through 2013 could expend relatively minor resources to accumulate large sums of bitcoins.

36.     It has been widely reported that Satoshi Nakamoto mined approximately 1 million bitcoins during this time.[3]

### Bitcoin "forks"

37.     Since its inception in 2009, Bitcoin has inspired the creation of over one thousand other digital currencies. Many of these new cryptocurrencies use characteristics of the initial Bitcoin program, but have made significant changes to the original model in an attempt to create

---

[3]     *See*     *e.g.*     http://time.com/money/5002378/bitcoin-creator-nakamoto-billionaire/; http://www.businessinsider.com/satoshi-nakamoto-owns-one-million-bitcoin-700-price-2016-6; https://eklitzke.org/how-many-bitcoins-did-satoshi-nakamoto-mine.

8

EXHIBIT 2
PAGE 27

an entirely new cryptocurrency with distinct functions or ones better suited to a specific market niche.

38.     In other cases, individuals have taken the actual Bitcoin protocol and modified it in a way they believed would improve Bitcoin itself, *e.g.*, by allowing more transactions into a single "block" of the blockchain.

39.     If the "improved" Bitcoin protocol garners significant support, but less than a majority of support, a new version of "Bitcoin" is created. In these situations, the supporters of the new Bitcoin, have created a "fork" through which the original Bitcoin blockchain/ledger is divided into two distinct, but identical, copies, (i) the original Bitcoin, and (ii) the new Bitcoin.  The result is that any individual who owned the original Bitcoin, now owns an identical amount of the new Bitcoin.  After the point of the "fork," the ledgers will diverge as owners "spend" the two assets differently.

40.     This has happened numerous times to Bitcin. To date, however, the original Bitcoin protocol remains the most valuable in terms of its correlation to the US dollar, with a market capitalization of ~$150 billion at the time of filing.  However, other noteworthy Bitcoin forks include Bitcoin Cash (market cap. of ~$25 billion), Bitcoin Gold (market cap. of ~$1.0 billion), Bitcoin Private (market cap of ~$510 million), and Bitcoin Diamond (market cap. of ~$650 million).

41.     As explained below, the bitcoins at the heart of this dispute were all mined prior to the creation of any of the aforementioned Bitcoin forks.  Consequentially, Plaintiffs' claims of

EXHIBIT 2
PAGE 28

ownership over these original bitcoins necessarily implicates ownership over their "forked" counterparts ("forked assets").[4]

## Background on parties and key individuals

42.     Dave Kleiman was born in 1967.  Obsessed with computers and technology at an early age, he joined the U.S. Army in 1986 as a helicopter technician.

43.     A few years after being honorably discharged, Dave got into a serious motorcycle accident which left him physically handicapped and wheelchair-bound.  After this accident, Dave's interest in computers intensified, and he began to build a reputation in computer forensics and secure network infrastructures.

44.     Dave began working in the information technology security sector in 1990.  He was a frequent speaker at national security conferences and was a regular contributor for many security related newsletters, websites, and online forums.

45.     Dave was a member of several computer security organizations, including the International Association of Counter Terrorism and Security Professionals (IACSP), International Society of Forensic Computer Examiners (ISFCE), Information Systems Audit and Control Association (ISACA), High Technology Crime Investigation Association (HTCIA), Network and Systems Professionals Association (NaSPA), Association of Certified Fraud Examiners (ACFE), Anti-Terrorism Accreditation Board (ATAB), and ASIS International.

46.     Dave was also a Secure Member and Sector Chief for Information Technology at the FBI's InfraGard and a Member and Director of Education at the International Information Systems Forensics Association (IISFA).  When he attended conferences, he was known as "Dave

---

[4] Consequently, where appropriate, the word "bitcoins" should be construed to include claims over the "forked assets" as well.

EXHIBIT 2
PAGE 29

Mississippi," a nickname referring to the long string of three letter certificates that followed his name; which could literally be used to spell Mississippi.

47.     Dave co-authored and was the technical editor of numerous publications, including *Perfect Passwords: Selection, Protection and Authentication*,[5] and Security Log Management: Identifying Patterns in the Chaos.[6]

48.     In 2010, Dave was hospitalized.  He was in and out of medical facilities due to MRSA infected sores.  On March 22, 2013, Dave signed out of the hospital against medical advice. He was unstable and nearing death.[7]  On April 26, 2013, Dave passed away.

49.     Ira is Dave's brother and the personal representative of his estate.

50.     Craig is a 46-year-old Australian computer scientist and businessman.  Craig began his career in information technology working for various entities in Australia, including the Australian Securities Exchange.  Craig claims to have many degrees, including doctorates, masters, and technical certifications; these claims are disputed.[8]

51.     In May 2016, Craig claimed that he and Dave were Satoshi Nakamoto—the venerated creator of Bitcoin.

---

[5]https://www.amazon.com/Perfect-Passwords-Selection-Protection-Authentication/dp/1597490415.

[6] https://www.amazon.com/Security-Log-Management-Identifying-Patterns/dp/1597490423.

[7] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

[8]  https://www.forbes.com/sites/thomasbrewster/2015/12/11/bitcoin-creator-satoshi-craig-wright-lies-hoax/#12e524116794.

11

EXHIBIT 2
PAGE 30

## Dave and Craig's early relationship

52.     Dave and Craig met in or around 2003. Both men had a longtime interest in cyber security and digital forensics, and the future of money.  (Ex. 1 at 26).[9]

53.     For years, they communicated on various topics related to the internet and file sharing.  For example, in 2008 they co-authored a paper on the mechanics of overwriting hard drive data.[10]

54.     Around that time, they began to speak about ways to use peer-to-peer file sharing, infamously used by the Napster music sharing service, to solve some of the most difficult issues in cryptography.  (Ex. 1 at 27).

55.     In March 2008, just a few months before Satoshi's paper on the Bitcoin protocol was published, Craig emailed Dave saying:  "I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money.  Bit cash, Bitcoin . . . [y]ou are always there for me Dave.  I want you to be part of it all."  (Ex. 32).[11]

56.     After leaving his job in late 2008, Craig wrote to Dave:  "I need your help.  You edited my paper and now I need to have you aid me build this idea."  (Ex. 1 at 31).  For the next few months, Craig and Dave worked to get Bitcoin operational.

57.     On January 12, 2009, Craig, Dave, and two others sent each other bitcoin transactions recorded on the blockchain.  (Ex. 1 at 32).

58.     On November 26, 2009 (Thanksgiving Day), Ira Kleiman and Dave met at their father's home for an early dinner.  He and Dave discussed Facebook's recent success and Ira asked

---

[9] All Exhibit citations refer to the as filed ECF pagination.

[10] https://www.vidarholen.net/~vidar/overwriting_hard_drive_data.pdf.

[11] Craig sent a "copy" of this communication to Ira on March 6, 2014.

12

EXHIBIT 2
PAGE 31

Dave if he was working on anything interesting. Dave responded by telling Ira he was working on "something bigger" than Facebook, that he was "creating his own money."

59.     Ira asked Dave to clarify and jokingly asked if Dave was making counterfeit money.

60.     Dave responded by saying he was making "digital money." He then opened his wallet, took out a business card, flipped it over, drew a "B" with a line or two through it, and commented on how "we" were working on a logo.

61.     Dave told Ira he was working with a relatively wealthy foreign man who owned some properties. Ira asked Dave why he didn't partner with this wealthy individual. Dave was silent, which Ira understood to be Dave's concession they were already partners.

62.     On May 20, 2014, Ira shared this story with Craig via email. (Ex. 2).

63.     Craig responded that same day stating "we did partner ;)". (*Id.*). Craig then commented on the "properties" stating, *inter alia*, that he owned 550 acres. (*Id.*). He then said, "I will have to see what I can dig up. The old Bitcoin logo we did is no longer used. I have a copy." (*Id.*). Craig later provided Ira with a copy of this Bitcoin logo. (*Id.*).

64.     This independent verification that Dave was creating "digital money" with Craig in 2009, Craig's admissions that he and Dave were "partners" in this venture, part of the Satoshi team, and that they were mining bitcoin through W&K, all lead to the inescapable conclusion that their collaboration in "creating" or "mining" bitcoin and intellectual property was continuous from 2009 until Dave's passing in 2013.

65.     From their collaboration in 2008 until Dave's death in 2013, Craig and Dave mined over a million of the initial bitcoins together (personally and through W&K). These bitcoins were, as all bitcoin are, stored in specifically identifiable bitcoin wallets that Craig has now asserted ownership over.

13

EXHIBIT 2
PAGE 32

66.     Further, Dave, in partnership with Craig, created intellectual property both in his individual capacity and through W&K. As Craig email to Ira on March 7, 2014, "I had an idea, but it would never have executed without Dave." The estate and/or W&K owns all this intellectual property.[12]

### Dave and Craig created W&K to mine bitcoin and develop blockchain related intellectual property

67.     The exact structure of their joint mining activities, intellectual property development, and "partnership" from c. 2008 until February 2011 requires discovery to fully reveal.

68.     From February 2011, Craig and Dave conducted their bitcoin mining activities and intellectual property research and development through W&K.

69.     On February 14, 2011, Dave formed W&K Info Defense Research LLC ("W&K") in Florida. The Articles of Incorporation for W&K list Dave as the managing member and registered agent. (Ex. 3).

70.     W&K has no operating agreement and its exact ownership structure is unclear due to Craig's contradictory statements.  In an affidavit Craig filed in Australian court proceedings, Craig stated he and Dave each owned 50% of W&K.  (Ex. 4 at 5).  But in a fake "contract" produced by Craig, he states Dave owned legal title to 100% of W&K, while holding 50% in trust for Craig.  (Ex. 5 at 3).  He doubled down on some form of this equal split in a 2014 email to Ira,

---

[12] The exact division of intellectual property ownership between Dave's estate and/or W&K will be determined at trial. Accordingly, some counts contain a request for relief from both Plaintiffs, and it will be for the final finder of fact to determine what each Plaintiff is entitled to recover.

EXHIBIT 2
PAGE 33

where he represented that "Dave owned 50% of" W&K. (Ex. 6 at 2),[13] and when both he and his counsel referred to it as a "joint venture." (Ex. 4 at 50, 57, 64, 71, 77, 84; Ex. 9 at 6). In contrast, Craig has testified to this Court that he does not have, and never has had, any interest in W&K.[14] (Ex. 29 ¶ 10). But it makes sense Craig would have some form of indirect interest as the entity appeared to be named after them both: **W**right & **K**leiman.

71.     As best as can presently be discerned, Dave was the sole "member" of W&K, but Craig maintained some kind of beneficial ownership interest in W&K, which he subsequently disclaimed.

72.     Regardless of its exact ownership structure, the purpose of W&K was clear: Craig and Dave created it to mine bitcoin and develop intellectual property.

73.     *First*, on telephone conversations with Ira, Craig admitted this was W&K's purpose.

74.     *Second*, Craig has admitted this in writing multiple times. For example, in a "chronology" Craig sent to Ira, he wrote that that W&K "was set up to further statistical and risk mitigating algorithms, to develop some ideas around CBT learning methodologies, and to mine Bitcoin." (Ex. 7). Craig also put this admission into legal documents he claims are valid stating that W&K "is the owner of and conducts the business known as Bitcoin mining and Software development / Research." (Ex. 5 at 3). Finally, Craig has admitted this to third parties where, e.g.,

---

[13]  This Second Amended Complaint attaches certain emails with timestamps from Australian time zones. For consistency, the Second Amended Complaint has converted various timestamps to Eastern Standard Time.

[14]  When confronted with the claims in this lawsuit, Craig didn't hesitate to continue his fraud against W&K and Dave's estate by perjuring himself in a sworn declaration filed with this Court, wherein he now swears, in absolute conflict with his Australian affidavit, that he never had any interest in W&K. See *Infra*, 160-170. It seems that whatever interest he once held in W&K, he has disclaimed it.

on February 12, 2014, he emailed Dave's former business partners stating "Dave and I had a project in the US.  He ran it there . . .  The company he ran there mined Bitcoin."  (Ex. 8 at 5).

75.     *Third*, in leaked ATO transcripts, Craig's bookkeeper states that "W&K was an entity created for the purpose of mining Bitcoins." (Ex. 9 at 3).

76.     Dave and Craig collaborated within W&K to create intellectual property.  Craig then used W&K and this intellectual property to personally solicit business from the United States Department of Homeland Security ("DHS").  (Ex. 4 at 40-43).

77.     Craig acted as W&K's "authorized representative," its "lead researcher," and its "technical contact."  (*Id.* at 45-46, 50, 56-57, 63-64, 70-71, 76-77, 83-84, 90).  Further, Craig repeatedly used W&K's Florida address as his own, *e.g.*, identifying it as his "mailing address." (*Id.* at 50, 57, 64, 71, 77, 84). Craig has also held himself out as W&K's "legal agent and representative" and its "Director/Australian Agent." (Ex. 30).

78.     Craig also claimed to have (i) delivered servers and other computer hardware to Florida for W&K's use (Ex. 10 at 3 (Recital L)); (ii) provided "contract labour services" to W&K (Ex. 11 at 2); (iii) licensed software for W&K's use (Ex. 10 at 3 (Recital M)); and (iv) loaned money to W&K for use in its Florida mining operation (Ex. 10 at 3 (Recital L); Ex. 11 at 3).

**Dave and/or W&K owned a substantial amount of bitcoin**

79.     The exact number of bitcoins belonging to Dave's estate and/or W&K will be determined at trial.[15]   That said, various documents including emails, "contracts," spoken admissions, and transcripts from 2014 ATO meetings with Craig, his counsel, and his accountant

---

[15] Accordingly, some counts contain a request for relief for both Plaintiffs, and it will be for the final finder of fact to determine how much each Plaintiff is entitled to recover.

evidence Dave and Craig owned and controlled approximately 1,100,111 bitcoins (either together personally or through their shared interest in W&K).

80.     As discussed above, Craig admitted that he "did partner" with Dave in 2009 to create/mine "digital money," i.e., bitcoins.  And Craig has also admitted in multiple documents that W&K (beneficially owned, at the time, and in some form, by Dave and Craig) mined bitcoin. Due to the historically larger mining reward and low competition existing during that time, Craig and Dave's continuous joint bitcoin mining activity since 2009 would have resulted in an unparalleled fortune of bitcoins.

81.     Furthermore, in February 2014, Craig emailed two of Dave's other business partners stating Dave had mined an enormous amount of bitcoins, an amount *"far too large to email."*  (Ex. 8 at 5).

82.     In addition, a transcript of a February 18, 2014 meeting between the ATO and Craig demonstrates that Craig has led others to believe he took ownership of Dave's bitcoin.  The ATO investigator states:

> We thought yes, ***you've picked up some bitcoin ownership from the deceased director*** so we were trying to, you know, get the picture and connect all the dots.  (Ex. 12 at 20) (emphasis added).

83.     Minutes from a February 26, 2014 meeting between the ATO and Craig's bookkeeper (John Chester), document Craig's bookkeeper stating that Dave had an incredible amount of bitcoin, and implying that Craig assumed ownership of them when he died:

> Craig Wright had mined a lot of [b]itcoins . . . Craig had gotten approximately 1.1 million [b]itcoins. There was a point in time, when he had . . . around 10% of all the [b]itcoins out there.  Mr Kleiman ***would have had*** a similar amount. ***However***, Mr Kleiman ***passed away*** during that time.  (Ex. 9 at 3) (emphasis added).

84.     At the February 18, 2014 meeting, Craig's counsel states that W&K's bitcoins were transferred to Seychelles, Singapore, and UK trusts.  As Dave owned between 50% to 100% of

17

EXHIBIT 2
PAGE 36

W&K, *at least* half of the bitcoins allegedly transferred to the trusts belong to Dave (and/or they all belong to W&K):

> In 2009 the mining of bitcoin commences *** 2011, bitcoin was transferred overseas. R and D then conducted in the US under – by a joint venture company formed as . . . effectively info defence research LOC. Bitcoin mining continues throughout 2011. The bitcoins are derived by companies in Singapore and the Seychelles or entities in Singapore and the Seychelles, and they're actually trusts. Trustee companies and trusts established - or trustee companies in the United Kingdom and other trusts established in the Seychelles. Further work was planned. In early April 2013 unfortunately Dave . . . dies in the US towards the end of April 2013. (*Id.* at 6).

85. Years later, Craig admitted to Andrew O'Hagan that "his and Kleiman's mining activity ha[d] led to a complicated trust." (Ex. 1 at 36).

86. In a 2012 email Craig forwarded to Ira, Craig wrote to Dave reaffirming the joint nature of the bitcoin allegedly held in trust (emphasis added):

> From: Craig Wright [mailto:craig@rcjbr.org]
> Sent: Wednesday, 10 October 2012 4:55 PM
> To: Dave Kleiman [mailto:dave@davekleiman.com]
> Subject: FW: IFIP-WG11.9 CFP
>
> We need to discuss the trsut [sic] and work out what the [expletive] *we* are doing with it all. So, a good tax deductible way to have a visit and also write a paper. (Ex. 31)

87. In fact, Craig consistently referred to the "trust" as both Craig and Dave's, for example in another email Craig forwarded to Ira (emphasis added):

> From: Craig S Wright
> To: dave@davekleiman.com
> Subject: This week
> Date: Tue, 22 May 2012 09:45:31 +1000
>
> Dave,
> A recycled rant . . . the ATO are simply BS'ing again. It costs me money and in a way I guess they want to get a result through attrition rather than honesty. They will drain all I have if they can. **We do not touch the trusts**. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions and let them try

18

EXHIBIT 2
PAGE 37

[expletive] **on us** then. . . (Ex. 13) (bold emphasis added; profanity redacted).

88.     In a 2014 email exchange with Ira, Craig *admitted* that at least 300,000 of the 1,000,000+ bitcoins allegedly held in trust belong to Dave:

> From: Ira K <REDACTED@REDACTED>
> To: Craig S Wright <craig.wright@hotwirepe.com>
> Subject: Bond villains
> Date: Sat, Mar 1, 2014 at 2:42 PM
>
> Just to clarify on thoughts from previous email... In one of the email exchanges between Dave and you, he mentioned that you had 1 million Bitcoins in the trust and since you said he has 300,000 as his part. I was figuring the other 700,000 is yours. Is that correct?
> Ira
>  ---
> From: Craig S Wright <craig.wright@hotwirepe.com>
> To: Ira K <REDACTED@REDACTED>
> Subject: Re: Bond villains
> Date: Sat, Mar 1, 2014 at 3:00 PM
>
> Around that. Minus what was needed for the company's use
> Sent from my HTC. (Ex. 14).

89.     As discussed below in more detail, Craig provided fraudulent contracts to the ATO in an attempt to substantiate his ownership of bitcoins and intellectual property assets that belonged to Dave and/or W&K. Their authenticity aside, however, these "contracts" produced by Craig constitute his admission that Dave, Craig, and W&K collectively owned hundreds of thousands of bitcoins.

90.     For example, a 2011 contract produced by Craig includes a provision stating W&K expected to mine new bitcoin at a rate of 12,000 bitcoins per month for a period of over two years (312,000 bitcoin). (Ex.10).

19

EXHIBIT 2
PAGE 38

91.     Further, a 2012 contract provided to Ira by the ATO lists Bitcoin wallets containing over 650,000 bitcoins (the "2012 Deed of Loan"). Next to the list of wallets and total bitcoin held, there is a handwritten annotation stating: "*as agreed, all wallets to be held in UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW.*" (Ex. 15 at 9). This annotation is in Craig's handwriting.

92.     As can be seen, Dave, in partnership with Craig, lawfully mined and possessed hundreds of thousands of bitcoins both in his individual capacity and through W&K.

93.     The mined bitcoins were stored in wallets in the possession of Dave, Craig, W&K, and/or certain trusts. These wallets were not used for any purpose but to store the bitcoins for sale at some future date.

94.     As "partners" from c. 2008-2011, and then in some form of "co-owners/members" of W&K from 2011-2013, Dave and Craig shared the private keys to the bitcoins they mined. As demonstrated from emails produced by Craig, his ability to control the bitcoins continued once they were, allegedly, placed in trust.

**After Dave's death, Craig fraudulently converted the bitcoin and intellectual property that belonged to, and was possessed by, Dave and/or W&K**

95.     After Dave's death, Craig took sole ownership/control of all bitcoins and intellectual property owned by Dave and/or W&K and those that were held in trust for Dave and/or W&K and refuses to return any bitcoins or intellectual property to the estate or W&K.

96.     It appears that Craig needed to use W&K and Dave's assets to try and justify certain tax positions he claimed in Australia. To that end, he instituted an elaborate scheme to assert dominion over Dave's and W&K's bitcoin and intellectual property.

97.     To accomplish this scheme, Craig drafted and backdated at least three contracts, and forged Dave's signature on at least two, to create a fraudulent "paper trail" purporting to show

20

EXHIBIT 2

PAGE 39

that Dave transferred bitcoins and intellectual property rights that belonged to Dave and W&K, to

Craig.  These fraudulent contracts include:

> a. 2011 contract titled "Intellectual Property License Funding Agreement" (the "2011 IP Agreement") (Ex. 10);

> b. 2012 contract titled "Deed of Loan" (the "2012 Deed of Loan") (Ex. 15); and

> c. 2013 contract titled "Contract for the Sale of Shares of a Company Owning Business" (the "2013 W&K Sale Agreement") (Ex. 5).

98.     On their face, these contracts are demonstrably fraudulent in a number of manners.

99.     *First*, the electronic signatures on these documents are not Dave's.  They are substantially different than known examples of Dave's electronic and written signatures:

| Authentic Signatures 2/1/2013[16] & 7/30/2003[17] & 2/22/2012 | Signature on Fraudulent Contracts 4/22/2011 & 04/2/2013 |
|---|---|
|  |  |

---

[16] See Ex. 16 (signature on Computer Forensics LLC Operating Agreement).

[17] See Ex. 17 (signature on Dave's last will and testament).

21

EXHIBIT 2
PAGE 40

100.    In fact, this signature is a near identical copy of a computer-generated font called Otto, available here:  https://www.wfonts.com/font/otto.  When computer generated, this Otto font produces the signature:

Otto.ttf

*Dave Kleiman*

101.    When confronted with this information by Ira, Craig admitted the signatures were computer generated, but claimed there were other ways to prove their veracity.

102.    Craig has never provided additional evidence of their legitimacy.

103.    *Second*, the "Purchaser" listed in the 2013 W&K Sale Agreement is "Craig Wright R&D" and is further identified by its Australian Business Number (ABN) 97 481 146 384.  However, the entity associated with this ABN was not identified as "Craig Wright R&D" until September 2, 2013 – over three months after Dave died.[18]

104.    *Third,* the terms of the 2011 IP Agreement are nonsensical.  While it purports to "finance" W&K through the transfer of around 215,000 bitcoin, and requires W&K to "fund the software development using bitcoin," there was essentially nothing that could be purchased with bitcoins at that time.  Thus, no one could "finance" or "fund" anything with bitcoins then.  This calls the 2013 W&K Sale Agreement's purported "release" of this nonsensical "financing arrangement" into question.

105.    *Fourth,* the 2011 IP Agreement, the 2012 Deed of Loan, and the 2013 W&K Sale Agreement conflict with each other.  The 2011 IP Agreement provides that Bitcoin wallet 1933***XY8a would be held by Craig in escrow and revert to Craig only if W&K defaulted, but

---

[18] https://abr.business.gov.au/SearchByAbnHistory.aspx?abn=97481146384

22

EXHIBIT 2
PAGE 41

the 2013 W&K Sale Agreement provides that it will be "released to" Craig *despite* satisfaction of the liability, and the 2012 Deed of Loan shows that same wallet being placed into a trust by Craig with a notation that it be held there until Dave and Craig can set up a joint-company later.

106.     *Fifth*, the 2013 W&K Sale Agreement references 250,000 bitcoin and then 250,500 bitcoin as the amount of bitcoin Dave was to transfer to Craig.

107.     *Sixth*, the fraudulent signatures aren't witnessed or notarized.  Even the most un-sophisticated parties would understand that a contract purporting to release and transfer property valued at eight figures should be substantiated in some way with witnesses and/or notaries.

108.     *Lastly*, many of the contractual terms are extremely convenient for Craig.  For example, the 2011 IP Agreement provides for confidentiality even from family members, stipulates the value of 215,000 bitcoin at 40,000,000 AUD (when it was really worth around ~$250,000), and includes a "typo" showing the date as 2013, and amending it by hand to 2011 (likely because it was written in 2013).

109.     These red flags are rendered even more suspicious by the fact that the 2013 W&K Sale Agreement was purportedly signed a mere 10 days after Dave left the VA hospital, and no more than three weeks before he died.

110.     Craig has a documented history and habit of backdating contracts and documents to suit his needs.  During the February 18, 2014 interview with Craig by the ATO, Craig admitted that he backdated certain tax invoices.  (Ex. 12).  Further, Wired has written that Craig likely backdated numerous blog posts to further his claim of being Satoshi.[19]  Finally, in its 2015 audit

---

[19]     https://www.wired.com/2015/12/new-clues-suggest-satoshi-suspect-craig-wright-may-be-a-hoaxer/.

23

EXHIBIT 2
PAGE 42

of Coin-Exch, the ATO assessed tax liability and penalties against Craig for providing recklessly misleading tax information by, *inter alia*, backdating numerous documents.  (Ex. 18).

111.   As described herein, after Dave died, Craig unlawfully and without permission took control of the bitcoins from Dave's estate and from W&K by exercising exclusive possession over the private keys necessary to own, move, or sell the bitcoins belonging to Dave and/or W&K; actually using those private keys to move these bitcoins out of their wallets; claiming to own bitcoins really owned by W&K and/or Dave by virtue of fraudulent contracts Craig created; refusing to return bitcoins that belonged to the estate and W&K; moving them to, or holding these bitcoins in, "trusts" known only to him and controlled by him and preventing these assets from being returned to the estate and/or W&K; and using those bitcoins (or the "rights" to them) to make large trades for his Australian businesses.

112.   While the exact number of bitcoins stolen remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of *at least* 300,000 bitcoins that Craig controls in a trust (along with their forked assets).  But the estate may be entitled to even more bitcoins based on Dave and Craig's partnership from 2009 until 2011.

113.   Further, as Craig's admitted that the mining continued within W&K from 2011, W&K is entitled to the possession of all bitcoins mined through its operations since 2011 (along with their forked assets).

114.   To Plaintiffs' best knowledge, information, and belief, these bitcoins could number around ~1,100,111.[20]   Together, these bitcoins and their forked assets are worth approximately

---

[20] Should discovery reveal additional bitcoin were mined, either by Dave individually, or by W&K after Dave died, Plaintiffs may amend their Complaint to assert a claim over those bitcoins and their forked assets as well.

24

EXHIBIT 2
PAGE 43

$11,427,755,048.02, though at their peak in December 2017 they were worth ~$27,332,125,781.68.

115. Ira has requested Craig return these bitcoins, but Craig has not done so. In light of this refusal, demanding the return of the forked assets would be futile.

116. Thus, Craig has wrongfully asserted dominion over Dave and W&K's bitcoins forked assets, and intellectual property in a way that is inconsistent with Dave and W&K's ownership of those bitcoins, forked assets, and intellectual property which has damaged them both.

**Craig attempts to launder the stolen title to W&K's intellectual property, by securing "consent judgments" against W&K, without serving W&K, falsely representing W&K's consent, and using fraudulent contracts**

117. In July and August 2013, Craig filed two claims in New South Wales Supreme Court against W&K for ~$28 million each. (Ex. 11).

118. In both claims, Craig alleged that W&K agreed to pay Craig for property and consulting services necessary to "complete research" and that this contract was "bonded against the intellectual property of [W&K]." (Ex. 11 at 3, 9). The pleadings alleged that "the contract stated that a breach would lead to liquidated damages [and if] the liquidated amount is not paid all IP systems returns to the sole ownership of [Craig]." (*Id.* at 4, 10). The statements of claim allege that the intellectual property at issue was the "software and code used in the creation of a Bitcoin system" and "used by the US Military, DHS and other associated parties." (*Id.*).

119. W&K was never served, validly or otherwise, with these proceedings; Dave's estate was not even aware of them until long after the judgments had been entered.

120. Craig prevented W&K from participating in these proceedings as, *inter alia*, he filed, in both lawsuits, a false "Acknowledgment of Liquidated Claim" on behalf of W&K where he represented that W&K accepted and agreed to his claims. (Ex. 30). In these filings, Craig falsely identified himself as the "legal agent and representative for the defendant" and its

25

EXHIBIT 2
PAGE 44

"Director/Australian Agent" and falsely stated that "I acknowledge the whole of the amount being claimed by the plaintiff." (*Id.*). Further, he falsely identified his Australian address and email as the "Address for service" for W&K. (*Id.*).

121. Craig further prevented W&K from participating in the proceedings, by filing, on August 28, 2013, Consent Orders in both cases. (Ex. 19). These filings represent to the Australian courts that W&K consented to judgment being entered against it through the signature of its "authorised officer," a "J Wilson." (*Id.* at 2). But J Wilson – Craig's employee – was not authorized. Instead, Craig "elected" him a director at a "shareholder meeting" where only Craig was present and only Craig voted. (Ex. 4 at 5-6).

122. Craig did this even though (i) Craig did not have any direct or voting interest in this Florida LLC (only an indirect or beneficial interest), (ii) Dave's estate (which held at least 50% of the interest in the LLC) was not notified of the meeting, and (iii) even if Craig had a 50% voting interest in W&K, the election of Wilson was void because the "meeting" lacked a quorum.

123. In April 2014, Ira first learned of these court proceedings, when the ATO sent him some of the court documents. Ira confronted Craig for taking Dave and W&K's assets and concealing the court proceedings from Dave's estate. Craig admitted his subterfuge, but defended himself by claiming the ends justified the means:

> Ira: ". . . From [the] documents [I have] it appears clear to see a systematic transfer of assets out of W&K back to you . . . But you never mentioned any of the actions you were taking against W&K prior to contacting us."

> Craig: "Dave died. I did the actions to make sure that the court signed off on what Dave and I planned." (Ex. 20 at 18).

124. Importantly, these Australian claims, like the sworn testimony he submitted to this Court, are based on demonstrably false factual allegations. Specifically:

125. The July 2013 claim alleges the existence of an October 27, 2008 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services." (*Id.* at 2). However, W&K did not exist in 2008.

126. Also, the July 2013 claim alleges:

"[Craig] conducted four projects associated with the DHS (Dept. of Homeland Security USA) with [W&K] under contract:

    a. BAA 11-02-TTA 01-0127-WP  TTA 01 - Software Assurance:  Software Assurance through Economic Measures

    b. BAS 11-02-TTA 05-0155-WP TTA 05 - Secure Resilient Systems and Networks

    c. BAA 11-02-TTA 09-0049-WP TTA 09 - Cyber Economics

    d. BAA 11-02-TTA 14-0025-WP TTA 14 - Software Assurance MarketPlace (SWAMP)." (*Id.* at 9-10).

127. The July 2013 claim goes on to state that "these funds were rated as:

    a. TTA 01      US$ 650,000

    b. TTA 05      US$ 1,8000,000 (*sic*)

    c. TTA 09      US$ 2,200,000

    d. TTA 14      US$ 1,200,000." (*Id.* at 10).

128. However, these statements were false.  The results of Freedom of Information Act requests by Ira to the DHS reveals that W&K's applications for TTA 01, TTA 05, TTA 09, and TTA 14 were all denied by the DHS.  (Ex. 21).

129. The August 2013 claim also contains a demonstrably false allegation, alleging the existence of a January 8, 2009 contract between Craig and W&K, claiming that "[W&K] agreed

27

EXHIBIT 2
PAGE 46

to pay [Craig] for property and consulting services." (Ex. 11 at 2). But again, W&K did not exist until 2011.

130. On November 6, 2013, judgments appear to have been entered for both Australian claims. (Ex. 22). Craig's fraud to keep W&K and Dave's estate out of the litigation was successful as, in the judgment, the Court "**note[d] the agreement of the parties** that [Craig] will accept the transfer of the intellectual property held by the plaintiff in full and final satisfaction of the judgment." (*Id.*) (emphasis added).

131. To this day, Craig has used these fraudulently obtained judgments to assert ownership over the intellectual property assets developed by W&K and Dave. For example, in the February 18, 2014 meeting with the ATO, Craig's attorney represented to the ATO that "intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange . . . and so on." (Ex. 12 at 7). And later again stating: "Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust into Hotwire . . ." (*Id.* at 18). Further, as discussed in para 142-143, the ATO has provided Ira with "deeds" drafted and executed by Craig which show that his companies have taken ownership over the intellectual property created by W&K and "transferred" by virtue of these fraudulently obtained "judgments."

**Craig reaches out to Ira to cover up his fraud, deceive Ira into believing him, and secure an ally in his fight against the ATO**

132. With the ATO closely auditing Craig's activities, Craig knew he had to reveal some of his and Dave's bitcoin mining and blockchain work to justify various tax positions he took in Australia. Realizing this would lead the ATO to contact the Kleimans, Craig reached out first.

28

EXHIBIT 2
PAGE 47

133. Nearly ten months after Dave's death, on February 11, 2014, Craig reached out to Dave and Ira's 94 year old father Louis, and wrote:

> Date: Feb. 11, 2014
> From: Craig Wright <Craig.Wright@hotwirepe.com>
> To: Louis <REDACTED@REDACTED>
>
> Hello Louis,
>
> Your son Dave and I are two of the three key people behind Bitcoin . . .
>
> If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.
>
> Know also that Dave was a key part of an invention that will revolutionise the world . . .
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.
>
> I will let you know when I am in the USA.  (Ex. 23).

134. As Louis Kleiman was elderly, Ira took over the correspondence with Craig.

135. Craig told Ira he was partners with Dave and that no one knew about their collaboration or W&K. He explained to Ira that W&K was involved in Bitcoin mining and that it was quite successful.

136. Shortly after informing Ira about W&K, Craig told Ira that Craig and Dave were planning on starting a new company together called "Coin-Exch."  He explained to Ira that Dave's estate would receive shares in it worth millions.

137. On April 23, 2014, Craig wrote to Ira:

> Date: April 23, 2014 8:56pm
> From: Craig <craig@rcjbr.org>
> To: Ira <REDACTED@REDACTED.com>

EXHIBIT 2
PAGE 48

The software Dave updated, and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level. This is all good under the law. Basically the GST (like a Vat) cancels as it is an international transfer

What company owns right now is:

- Software – incl source code and perpetual licenses valued at over $50 million.
- Intellectual Property, design, codes etc
- Research claims. (Ex. 24).

138. At the same time Craig was defrauding the Kleimans, Craig also reached into Florida though an agent, Uyen Nguyen, to revive W&K after it had been administratively dissolved – to ensure he had control over it if necessary.

139. Consequently, on March 28, 2014, nearly a year after Dave died, W&K was reinstated by Craig's agent, Uyen Nguyen ("Uyen"). (Ex. 25). Uyen removed Dave as the registered agent for W&K and listed herself. (*Id.*). She then added herself as manager and secretary and an entity named Coin-Exch Pty Ltd as director. (*Id.*; ECF 12 at 11 n3). But Coin-Exch Pty Ltd was merely Craig seizing control of W&K from the shadows, as it's well established "Craig Wright" was the "director and controlling mind" of Coin-Exch Pty Ltd. (Ex. 18 at 5).[21]

140. Of course, despite Ira and Craig being in regular email contact at the time, Craig concealed this action from Ira.

**The ATO reached out to Ira to verify Craig's allegations over W&K, and provided Ira with documents that demonstrate Craig assumed control over intellectual property that belonged to W&K and/or Dave**

141. As Craig expected, on April 15, 2014, an auditor from the ATO, reached out to Ira to inquire about his knowledge concerning the legal action Craig took against W&K. The auditor provided Ira copies of the 2011 IP Agreement and the 2013 W&K Sale Agreement.

---

[21] https://www.arnnet.com.au/article/621503/australian-bitcoin-figure-supercomputing-company-enters-liquidation/.

30

EXHIBIT 2
PAGE 49

142. The ATO also provided Ira with three deeds, each titled "IP Deed of Assignment" and each executed on September 15, 2013 – nearly four months after Dave's death. (Ex. 26; Ex. 27; & Ex. 28). Each of these IP Deeds of Assignments assigned various intellectual property rights from DeMorgan Ltd to three entities: Coin-Exch Pty Ltd (Ex. 26), Hotwire Preemptive Intelligence Pty Ltd (Ex. 27), and Cloudcroft Pty Ltd (Ex. 28).

143. The deeds also described the source and nature of this IP: "The IP held in total by DeMorgan consists of source code, algorithms and patentable materials that have been obtained by Craig Wright R&D (ABD 97 481 146 384) through the following unrelated entities . . . W&K Information Defense Research LLC [as two batches]." (Ex. 26 at 4; Ex. 27 at 4; & Ex. 28 at 4).

**Craig continues to assure Ira and reveals the nature of the intellectual property owned by, and misappropriated from, W&K and Dave**

144. On April 22, 2014, Ira wrote to Craig that after he had time to review the documents sent by the ATO, he "felt like there [were] questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value . . . ." (Ex. 24 at 20).

145. To keep Ira from going public, Craig promised Ira that he could be paid out of what was owed to Dave's estate "based on what Dave and I had been arranging." (*Id.* at 12). On April 23, 2014, Craig told Ira that he would receive the first $12 million payment in October 2014. (*Id.* at 8).

146. On the same day, trying to further placate Ira, and further evidencing Dave and the estate's claim to W&K's transferred intellectual property, Craig wrote Ira stating:

> The software Dave updated and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level . . . Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code. (*Id.* at 2).

31

EXHIBIT 2
PAGE 50

147.     On April 25, 2014, still trying to reassure Ira, Craig sent Ira a chronology of his activities related to W&K and the development of its intellectual property.  In this document, Craig wrote:

> There is a lot of IP and 'stuff' in the mix.  All up, it's around a hundred million dollars' worth.  This IP originates in work CSW has been doing for more than 10 years; it originates in things that came from W&K; it has to do with the software acquired.  The values and distribution . . . amounts to a third each for Cloudcroft, Hotwire, and Coin exch.  Cloudcroft gets the security related IP, Coin-Exch gets the banking and Hotwire gets all of the automation R&D based stuff.  (Ex. 7).

148.     The nature of this intellectual property transferred from W&K to DeMorgan, Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft was further explained by Craig in a letter he published on DeMorgan's website in 2015.  This letter demonstrates that Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft were involved in building out W&K's intellectual property with R&D efforts targeted at "the development of smart contract and Blockchain based technologies" and "commercialisation of our Blockchain and smart contract systems research."[22]

149.     Craig's promise of a multi-million dollar payment by October 2014, never came true. Craig blamed the delay on the ATO investigation and kept promising Ira he would see value when the investigation closed.

150.     On October 9, 2015, Craig essentially stopped responding to Ira.

151.     In November 2015, Dave's friend and business partner, Patrick Paige reached out to Craig when a reporter called him inquiring about Craig and Dave's involvement in Bitcoin. Craig responded:

---

[22]http://www.businessinsider.com/craig-steven-wright-rumoured-bitcoin-creator-was-commercialising-blockchain-research-and-reviving-company-hotwire-2015-12; https://prwire.com.au/pr/51565/the-demorgan-ltd-group-of-companies-to-receive-up-to-54-million-from-ausindustry-r-amp-d-tax-rebate-scheme-1.

EXHIBIT 2
PAGE 51

> Thanks for the heads up. Reporters are always troubling. They ignored the stuff Dave and I did when he was alive. I don't know what has started to interest them now . . . as you know[, **Dave] did a fair amount of research with me. Most yet to be completed and published**. (Ex. 8 at 13 (emphasis added)).

152.    After Craig yet again confirmed Dave's involvement in Bitcoin and the intellectual property they developed, Patrick wrote back:

> . . . I think we both know Dave was a genius when it came to computers and I sure would like Dave to get recognition for his part if any in the development of bitcoins. I realize there is a lot of things to consider releasing this information but my question is when? (*Id.* at 12).

153.    Craig responded: "When it all comes out, there is no way Dave will be left out. **We need at least a year more**." (*Id.* (emphasis added)).

### Craig claims that he and Dave are Satoshi Nakamoto

154.    On December 8, 2015, two popular tech publications, *Wired* and *Gizmodo*, outed Craig as Satoshi.[23] Both articles also articulated Dave's integral role in the development of Bitcoin. They described numerous details and leaked communications implicating Dave and Craig's roles in creating and developing Bitcoin; they also discussed Dave and Craig's accumulation of a vast hoard of bitcoin.

155.    On May 2, 2016, nearly five months after the *Wired* and *Gizmodo* publications, Craig published a blog post in which he claimed to be Satoshi.[24]

156.    Craig has readily admitted Dave was intimately involved in the creation of Bitcoin. In numerous interviews with Andrew O'Hagan, documented in *The Satoshi Affair*, Craig told

---

[23] https://www.wired.com/2015/12/bitcoins-creator-satoshi-nakamoto-is-probably-this-unknown-australian-genius/; https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

[24] https://qz.com/674129/an-australian-nobody-claims-to-be-the-inventor-of-bitcoin-but-no-one-knows-for-sure/.

O'Hagan that "[Craig] did the coding and that Kleiman helped him to write the white paper." (Ex. 1 at 31).

157. Further, in numerous emails to Ira, Craig admitted the same.

158. Craig currently serves as Chief Scientist of a UK company called nChain in London, where, in 2016, he filed dozens of patents related to Bitcoin and blockchain technology through this entity.[25] The public filing of these patents disclosed to the public intellectual property belonging to Dave and W&K without the permission of Dave's estate and/or W&K.

159. To date, neither Dave's estate nor W&K have received the assets belonging to them as a result of their early involvement in Bitcoin and bitcoin mining.

### Fraud on this Court[26]

160. In Ira's initial Complaint, as in this one, he alleged that (i) Craig and Dave held some form of interests in a Florida LLC called W&K, that (ii) through this LLC, and otherwise, they mined over 1.1 million bitcoins and developed extremely valuable intellectual property, that (iii) after Dave died, Craig took unlawful possession of all the bitcoins the Florida LLC mined and intellectual property it created (along with the bitcoin and intellectual property they mined/developed together personally), that (iv) Craig then tried to "launder" this stolen intellectual property by defrauding the Australian courts into entering consent orders transferring clean title over W&K's intellectual property to Craig; and that (v) Craig needs to return the stolen property.

161. In response to this Complaint, Craig filed a motion to dismiss alleging he has essentially **no** connection to Florida or W&K. His motion stated Plaintiff's jurisdictional

---

[25] https://www.reuters.com/article/us-bitcoin-wright-fund-exclusive/exclusive-company-behind-bitcoin-creator-sold-to-private-investors-idUSKBN17F26V.

[26] The emphases appearing in this section have been added.

34

EXHIBIT 2
PAGE 53

allegations were "frivolous" and "sanctionable." (ECF D.E. 12 at 36). Craig supported these assertions with a sworn declaration stating he was never a shareholder, member, agent, employee, or representative of W&K. (Ex. 29 ¶¶ 11-12). He swore, under penalty of perjury under the laws of the United States, that he's never exercised authority or control over W&K. (*Id.* ¶ 13).

162. He perjured himself.

163. To procure his fraudulent Australian judgments, Craig submitted an affidavit to the Supreme Court of New South Wales where Craig affirmed that:

> "The **shareholding** of 'W&K Info Defense LLC' was:
>
> 1. **Craig S Wright**          **50.0%**
> 2. David A Kleiman          50.0%"

(Ex. 4 at 5).

164. Craig then doubled down on this ownership structure affirming further that "W&K Info Defense LLC was an incorporated partnership. **All shares are held jointly**." (*Id.*). He then affirmed that **he called a "shareholders meeting"** on August 16, 2013 at which only he and Jamie Wilson were present. (*Id.*). Craig affirmed **he was the sole vote** that nominated Jamie Wilson to act as a director "for purposes of consenting to orders and the company to be wound down." (*Id.* at 5).[27]

165. These affidavit statements directly contradict his sworn statements to this Court that (i) "I have never been a **. . . shareholder . . .** of W&K," (ii) "I have never been a **member** of W&K," and (iii) "I have never **exercised authority or control** over W&K **. . .**" (Ex. 29 ¶¶ 11-13).

166. But the perjury doesn't end there.

---

[27] Under Florida law, there is no such thing as an "incorporated partnership" and an LLC does not have "shares" or "directors" or hold shareholders' meetings. The "owners" of an LLC are called "members."

167. Craig attached voluminous records to his Australian affidavit. These attachments evidence Craig signed as the "**authorized representative**" of W&K six (6) times (Ex. 4 at 56, 63, 70, 76, 83, 90), identified himself as W&K's "**lead researcher**" twice (*id*. at 45-46), its "**technical contact**" six (6) times (*id*. 50, 57, 64, 71, 77, 84), affiliates himself with **W&K's Florida address** as, *e.g.*, his "**mailing address**" twelve (12) times (*id*. at 49, 56-57, 63-64, 70-71, 76-77, 83-84, 90), includes detailed descriptions of the computer programs and research Craig was **attempting to get DHS to fund** (*id*. at 50-94), and includes four (4) emails from DHS confirming Craig had **uploaded various proposals on behalf of W&K attempting to secure funding** (*Id*. at 40-43). Collectively, these documents clearly evidence Craig's participation in operating W&K from Florida to solicit business from the United States DHS.

168. Obviously, these affidavit attachments are in direct conflict with Craig's sworn statements to this Court that (i) "I have never been a . . . **employee,** or **representative** of W&K," (ii) "I have never been an **agent** of W&K," (iii) "I have never . . . **developed software for** any purpose relating to a Florida business, including **W&K**," (iv) "I have never **advertised services in Florida**," (v)  "I have never had an **office in Florida**," and (vi) "I have never **exercised authority or control over W&K** . . ."  (Ex. 29 ¶¶ 6, 8, 11-13, 15).

169. As mentioned in ¶ 120, Craig also submitted two "Acknowledgment of Liquidated Claim" filings in Australia where he signed as the "**legal agent and representative**" of W&K and as its "**Director/ Australian Agent**." (Ex. 30). As set forth in ¶¶ 138-139 he also acted as the "**director**" of W&K when he had his agent put Coin-Exch, his company, as its director.  These also directly conflict with his sworn testimony above.

170. Craig's boldfaced misrepresentations and perjury before this Court constitute a continuation of his grand fraud to unlawfully take Plaintiffs' assets.  Said differently, Craig's latest

36

EXHIBIT 2
PAGE 55

fraud on this Florida Court is simply one more action he's taken in Florida to defraud Dave's estate and W&K.

## CLAIMS FOR RELIEF

### COUNT I
### Conversion
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

171.    On or about April 2013 through the present day, Defendant converted to his own use, bitcoins, forked assets, and intellectual properties that was then the property of, and owned by, the estate and/or W&K.

172.    The property was worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over it.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages in the amount of at least $11,427,755,048.02 and/or return of the wrongfully converted bitcoins with their forked assets. Plaintiffs demands the return of the IP, or its fair market value. Plaintiffs also demand punitive damages, together with court costs, interest, and any other relief this Court deems just and proper.

### COUNT II
### Unjust Enrichment
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

173.    Plaintiffs have conferred a benefit on the Defendant, who has knowledge thereof.

174.    Defendant voluntarily accepted and retained the benefit conferred.

175.    The circumstances render Defendant's retention of the benefit inequitable unless the Defendant pays to Plaintiffs the value of the benefit.

176.    Defendant has been unjustly enriched at Plaintiffs' expense.

177.     Plaintiffs are entitled to damages as a result of Defendant's unjust enrichment, including disgorgement of all monies and or properties unlawfully accepted and retained by Defendant from Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant for the return of the wrongfully retained property or monetary damages equaling to the value thereof, together with court costs, interest, and any other relief this Court deems just and proper.

### COUNT III
### Misappropriation
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

178.     After Dave's death, Craig unlawfully, willfully, and maliciously misappropriated trade secrets belonging to Dave and/or W&K relating to blockchain based technologies and smart contracts by using them for himself and using a series of fraudulent contracts, misrepresentations, and fraudulently obtained court judgments to transfer/acquire the property rights in these trade secrets to/for himself.

179.     These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts.  These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

180.     These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. As evidence of the substantial economic value relating to these trade

38

EXHIBIT 2
PAGE 57

secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

181.    Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets.  Dave made no disclosures of these trade secrets to anyone but Craig.

182.    As a proximate result of Craig's unlawful misappropriation, Dave's estate and/or W&K have suffered actual losses consisting of the loss in economic value associated with the trade secrets.

183.    As a proximate result of Craig's unlawful misappropriation, Dave's estate and W&K are informed and believe that Craig has been unjustly enriched.

184.    As a proximate result of Craig's unlawful and willful misappropriation, Dave's estate is entitled to a recovery of damages pursuant to Fla. Stat. § 688.004.

WHEREFORE, Plaintiffs demand judgment against Defendant for all available damages caused by Craig's misappropriation, including exemplary damages, together with court costs, interest, attorney's fees pursuant to Fla. Stat. 688.005, and any other relief this Court deems just and proper.

## COUNT IV
### Federal Defense of Trade Secrets Act
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

185.    Craig's conduct described in this Second Amended Complaint constitutes misappropriation of trade secrets under the Defend Trade Secrets Act.  18 U.S.C. §§ 1832.

186.    These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts which is a product used

39

EXHIBIT 2
PAGE 58

and intended to be used in interstate and foreign commerce.  These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

187.    These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use. As evidence of the substantial economic value relating to these trade secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

188.    Craig caused many of these patents to be filed *after* May 11, 2016.

189.    Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets.  Dave made no disclosures of these trade secrets to anyone but Craig.

190.    As a proximate result of Craig's unlawful misappropriation, Dave's estate has suffered actual losses consisting of the loss in economic value associated with the trade secrets.

191.    As a proximate result of Craig's unlawful misappropriation, Dave's estate is informed and believes that Craig has been unjustly enriched.

WHEREFORE, Plaintiffs demand judgment against Defendant for the value of the wrongfully taken intellectual property, together with court costs, interest, attorney's fees, and any other relief this Court deems just and proper.

## COUNT V
### Breach of Fiduciary Duty
*(Asserted by the Estate and W&K)*

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

192.     Although Craig did not have a direct ownership interest in W&K, he owed fiduciary duties to the LLC, as, *inter alia*, its agent, its purported "authorized representative," "lead researcher," "technical contact," "legal agent and representative" and "Director/Australian Agent." Although lacking any authority to do so, upon Dave's death Craig assumed *de facto* control and management of W&K and thereby incurred fiduciary duties to act in the LLC's, and its member's, best interests.

193.     In the alternative, just as the shareholders of a closely held corporation have partnership-like fiduciary duties to each other, Craig and Dave acted as partners in the management and operation of W&K, and thus Craig owed fiduciary duties of care, loyalty, and good faith to Dave, his estate, and W&K, by virtue of their joint venture.

194.     In the alternative, if Craig *was* an actual member in W&K Info Defense LLC, Craig owed fiduciary duties of care, loyalty, and good faith to W&K, Dave, and his estate pursuant to Fla. Stat. § 605.04091.

195.     Craig breached his fiduciary duty of loyalty and good faith, by, among other things, intentionally and wrongly transferring assets that belonged to Dave's estate and/or W&K to himself and/or companies controlled by him.

196.     Dave's estate and or W&K have been damaged by Craig's breach of his fiduciary duties.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages and/or return of the wrongfully taken bitcoins, forked assets, and intellectual property, together with court costs, interest, and any other relief this Court deems just and proper.

41

EXHIBIT 2
PAGE 60

## COUNT VI
### Breach of Partnership Duties of Loyalty and Care
(*Asserted by the Estate*)

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

197.    From c. 2008 until at least the creation of W&K in 2011, Craig and Dave associated to carry on as co-owners of a business for profit to create Bitcoin, mine bitcoins, and create other block chain intellectual property. Pursuant to Fla. Stat. § 620.8202, and Craig's admission of same, this formed a partnership.

198.    Pursuant to Fla. Stat. § 620.8404(2), Craig owed Dave a duty of loyalty to, *inter alia*, "account to the partnership and hold as trustee for the partnership any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity.

199.    Pursuant to Fla. Stat. § 620.8404(3), Craig owed Dave a duty of care to refrain from engaging in intentional misconduct, or a knowing violation of law.

200.    Craig breached these duties of loyalty and care by, *inter alia*, stealing Dave's bitcoins and any intellectual property Dave owned and or designed during the c. 2008-2011 timeframe (or any other time they partnered).

201.    Pursuant to Fla. Stat. §§ 620.8405, Dave's estate brings this action for breach of the duties of loyalty and care owed under Fla. Stat. § 620.8404, including but not limited to its rights pursuant to Fla. Stat. §§ 620.8401, 620.8403, 620.8807, its right to have its partnership interest purchased pursuant to § 620.8701, and to otherwise enforce the rights and protect the interests of Dave's estate.

EXHIBIT 2
PAGE 61

WHEREFORE, Plaintiff demands judgment against Defendant for damages, and purchase of his partnership interest together with court costs, interest, and any other relief this Court deems just and proper.

**COUNT VII**
**Fraud**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

202.    As detailed above, Defendant made knowing false statements of fact, intentional omissions of material facts, and falsely promised future action with no intention of performing and/or specifically intending not to perform. These included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred, sold, and/or returned to Craig pursuant to valid contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

203.    Defendant took these actions/omissions with the purpose of inducing Plaintiffs to rely on these fraudulent acts and omissions.

204.    Plaintiffs acted in reliance on Defendant's fraudulent representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

43

EXHIBIT 2
PAGE 62

205.     As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT VIII
## Constructive Fraud
### (Asserted by the Estate and W&K)

Plaintiffs incorporate paragraphs 1 to 170, and 192-205.

206.     As detailed above, a fiduciary relationship existed between Craig and W&K and Craig and Ira.

207.     Craig invited W&K and Ira's utmost trust and loyalty as their fiduciary.

208.     Plaintiffs reposed the utmost trust and loyalty in Craig.

209.     Craig intentionally violated Plaintiffs trust and confidence, took unconscionable advantage of Plaintiffs, abused and took improper advantage of their confidential and fiduciary relationship, and materially breached his fiduciary duties to them both by knowingly making false statements of fact, intentional omissions of material facts, remaining silent in light of a duty to speak, falsely promising future action with no intention of performing and/or specifically intending not to perform, and by engaging in unfair methods against them. These fraudulent representations/omissions included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred, sold, and/or returned to Craig pursuant to valid

44

EXHIBIT 2
PAGE 63

contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

210.    As detailed above, at the time Craig made those false statements and material omissions, and concealed his misconduct, a fiduciary relationship existed between Craig and Ira, and Craig and W&K, as Craig owed fiduciary duties and duties of care and loyalty to the estate and W&K.   Craig induced Ira's reliance and Craig took an improper/unconscionable/unfair advantage of, and abused, the fiduciary and confidential relationship at Ira and W&K's expense. Craig's misrepresentations and omissions were intentional, for the specific purpose of defrauding the estate and W&K of their property, but in any event, regardless of intent, Craig is liable for constructive fraud.

211.    Plaintiffs acted in reliance on Defendants fraudulent and unfair representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

212.    As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court

judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT IX
## Permanent Injunction
### *(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

213.    Craig's unlawful taking of the bitcoins and intellectual property belonging to Plaintiffs has resulted in great and irreparable injury to them both as they have been deprived of unique, limited, and valuable digital assets.

214.    Neither Plaintiff can be fully compensated in damages and is without adequate remedy at law.

WHEREFORE, Plaintiffs request this Court enter an injunction ordering Defendant to return all bitcoins, forked assets, and intellectual property unlawfully taken from Plaintiffs.

## COUNT X
## Civil Theft - § 772.11 Fla. Stat.,
### *(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

215.    On or about April 2013 through the present day, Defendant knowingly and wrongfully took, with felonious criminal intent, bitcoins, forked assets, and intellectual properties that were then the property of, and owned by, the estate and/or W&K.

46

EXHIBIT 2
PAGE 65

216.     Defendant took these with the intent to deprive Plaintiffs of the right to these properties and to appropriate the properties to his own use and the use of others not entitled to use the properties.

217.     Defendant also trafficked in, and endeavored to traffic in, properties that he knew were stolen and properties that he initiated, organized, planned, financed, directed, managed, and supervised, the theft of.

218.     The properties were worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over them.

219.     The actions taken by Defendant were done intentionally and maliciously as part of a scheme designed to defraud Plaintiffs of their assets.

220.     On June 19, 2018, pursuant to § 772.11 Fla. Stat., counsel for Plaintiffs sent the demand required by Florida Law required to initiate a claim for civil theft.  (Ex. 33.)

221.     Defendant has not complied with that demand.

222.     Plaintiffs have been damaged as a result of Defendants actions.

223.     Plaintiffs have retained the undersigned to represent them in this action and in so doing have incurred an obligation for the payment of attorney's fees and costs.

WHEREFORE, Plaintiffs demand judgment against Defendant awarding damages, including treble damages and attorney's fees pursuant to § 772.11 Fla. Stat. as well as ordering Defendant to divest himself of relevant enterprise(s), as well as granting such other relief as the Court deems just, equitable and proper.

EXHIBIT 2
PAGE 66

**Plaintiffs demand a trial by jury for all issues triable by right.**

Dated:  January 14, 2019

                              Respectfully submitted,

                              **BOIES SCHILLER FLEXNER LLP**

                              By: */s/Velvel Devin Freedman*
                              Velvel (Devin) Freedman
                              **BOIES SCHILLER FLEXNER LLP**
                              100 SE Second Street
                              Miami, FL 33131
                              Tel.     (305)539-8400
                              Fax.     (305)539-1307
                              Email: vfreedman@bsfllp.com

                              Kyle Roche
                              **BOIES SCHILLER FLEXNER LLP**
                              333 Main Street
                              Armonk, NY 10504
                              Tel.     (914)749-8200
                              Fax.     (914)749-8300
                              Email: kroche@bsfllp.com
                              *Admitted pro hac vice*

                              Attorneys for Plaintiffs
                              IRA KLEIMAN in his capacity as Personal
                              Representative of the Estate of David Kleiman and
                              W&K Info Defense Research, LLC.

48

EXHIBIT 2
PAGE 67

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 14, 2019, a true and correct copy of the foregoing

was filed with CM/ECF, which caused a copy to be served on all counsel of record.

<em>/s/ Velvel (Devin) Freedman</em>
Velvel (Devin) Freedman

EXHIBIT 2
PAGE 68

# EXHIBIT 3

EXHIBIT 3
PAGE 69

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No. 18-CV-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al*.,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

## ORDER ON MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Defendant Craig Wright's ("Craig" or "Defendant") Motion to Dismiss, ECF No. [33] (the "Motion"). The Court has considered the Motion, the record, the parties' briefs, and the applicable law. For the reasons that follow, the Motion is granted in part and denied in part.

## I.    BACKGROUND

Plaintiff W&K Info Defense Research, LLC is a Florida limited liability company that was incorporated in 2011. ECF No. [24], at ¶ 2. Plaintiff Ira Kleiman is David Kleiman's ("Dave") brother and is the personal representative of his estate (the "Estate"), and is a resident of Palm Beach County, Florida. *Id.* at ¶ 1. Defendant Craig Wright is an Australian citizen who presently resides in London, England. *Id.* at ¶ 3.

Dave and Craig met in or around 2003. *Id.* at ¶ 52. Their relationship centered around their mutual interest in cyber security, digital forensics, and the future of money. *Id.* Around 2008, Dave and Craig began to speak about ways to use peer-to-peer file sharing to solve issues in cryptography. *Id.* at ¶ 54. The Amended Complaint alleges

EXHIBIT 3
PAGE 70

that for the next several years, Dave and Craig worked together in developing Bitcoin, and that through their collaboration they mined over a million bitcoins together. *Id.* at ¶¶ 53-57, 65. These bitcoins were stored in specifically identifiable bitcoin wallets, over which Craig now asserts ownership. *Id.* at ¶ 65.

### A. Bitcoin

On October 31, 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto (the "Satoshi White Paper") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts. *Id.* at ¶ 30. This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust." *Id.* In May of 2016, Craig publicly claimed that he and Dave were the creators of Bitcoin. *Id.* at ¶ 16. Bitcoin is a decentralized digital currency that uses a ledger to track the ownership and transfer of every bitcoin in existence. *Id.* at ¶ 20. This ledger is called the "Bitcoin Blockchain." *Id.* In order to complete a transaction with bitcoins, you must have a bitcoin wallet. *Id.* at ¶ 21. "Wallets" are computer files dedicated to storing bitcoin information. *Id.* Each bitcoin wallet has a "public key" that is used as the "address" to receive bitcoin from others. *Id.* Each wallet is also assigned a "private key." *Id.* at ¶ 22. To send bitcoin out of a wallet, an individual must have the private key associated with that bitcoin wallet. *Id.*

There are two methods of acquiring bitcoins. The first is simply receiving bitcoins from someone. *Id.* at ¶ 23. The second way one can acquire a bitcoin is by "mining" them. *Id.* at ¶ 24. Bitcoin is designed without a centralized authority to curate the blockchain. *Id.* at ¶ 25. Therefore, "mining" is a process through which anyone with

2

EXHIBIT 3
PAGE 71

internet access can update the ledger and "mine bitcoins" by employing computer power to solve a complex computer problem. *Id.* at ¶ 26. The first "miner" who solves the problem gets the right to update the ledger by adding a block of recent transactions to the blockchain. *Id.* The protocol pays the successful miner in newly minted bitcoins, the number of which is determined by a pre-existing algorithm. *Id.*

Since its beginning, Bitcoin has inspired the creation of over one thousand other digital currencies. *Id.* at ¶ 37. These new currencies often borrow from the initial Bitcoin program but make changes to the model in an attempt to create a new cryptocurrency with distinct functions or more suited to a specific market or niche. *Id.* In other cases, Bitcoin has been modified by individuals in a way they believed would improve the Bitcoin itself, such as by allowing more transactions into a single block of blockchain. *Id.* at ¶ 38. In these situations, the supporters of the new Bitcoin, have created a "fork" through which the original Bitcoin blockchain/ledger is divided into two distinct, but identical, copies, (i) the original Bitcoin, and (ii) the new Bitcoin. *Id.* at ¶ 39. The result is that any individual who owned the original Bitcoin now owns an identical amount of the new Bitcoin. *Id.*

### B. W&K Info Defense Research, LLC

On February 14, 2011, Dave formed W&K Info Defense Research LLC ("W&K") in Florida. *Id.* at ¶ 69. The Articles of Incorporation for W&K list Dave as the managing member and registered agent. *Id.* Dave and Craig allegedly created W&K to mine bitcoin and develop intellectual property. *Id.* at ¶ 72. W&K has no operating agreement, and Plaintiffs claim that due to receiving several conflicting statements from Craig, they are not certain of the exact ownership structure of W&K. *Id.* at ¶ 70. Dave, in

3

EXHIBIT 3
PAGE 72

partnership with Craig, created intellectual property both in his individual capacity and through W&K. *Id.* at ¶ 66. Plaintiffs assert that the Estate and/or W&K own all of this intellectual property. *Id.*

W&K was used to solicit business from the United States Department of Homeland Security ("DHS"). *Id.* at ¶ 76. Craig acted in many different capacities on behalf of W&K, including authorized representative, lead researcher, technical contact, legal agent and representative and Director/Australian Agent. *Id.* at ¶ 77. Craig also used W&K's Florida address as his mailing address associated with W&K. *Id.*

### C. Dave Kleiman's Death

Dave passed away in April of 2013. *Id.* at ¶ 48. The Amended Complaint alleges that after Dave's death, Craig unlawfully and without permission took control of the bitcoins from the Estate and from W&K once he had exclusive possession over the private keys necessary to own, move, or sell the bitcoins belonging to Dave and/or W&K. *Id.* at ¶ 111. Craig used the private keys that Dave and Craig shared to move the bitcoins out of their wallets and then claimed to own bitcoins really owned by W&K and/or Dave by creating a series of fraudulent contracts and documents. *Id.* Craig then moved the stolen bitcoin into trusts only known and controlled by him for use in making large trades for his Australian businesses. *Id.* While the exact number of bitcoins stolen remains to be determined, the Amended Complaint contends that the Estate is entitled to at least 300,000 bitcoins, along with their forked assets. *Id.* at ¶ 112.

### D. The Australian Judgments

After Dave's death, in July and August of 2013, Craig filed two claims in the Supreme Court of New South Wales against W&K for approximately $28 million each.

4

EXHIBIT 3
PAGE 73

*Id.* at ¶ 117.  In both claims, Craig alleged that W&K agreed to pay Craig for property and consulting services necessary to "complete research," and that this contract was "bonded against the intellectual property of [W&K]."  *Id.* at ¶ 118.  In his pleadings filed before the Australian courts, Craig claimed that any breach of contract "would lead to liquidated damages [and if] the liquidated amount is not paid all IP systems returns to the sole ownership of [Craig]."  *Id.*  The statements of claim alleged that the intellectual property at issue was the "software and code used in the creation of a Bitcoin system" and "used by the US Military, DHS and other associated parties."  *Id.*  Plaintiffs claim that W&K was never served with process for these proceedings in Australia.  *Id.* at ¶ 119.

In both lawsuits, Craig filed an "Acknowledgment of Liquidated Claim" on behalf of W&K where he represented that W&K accepted and agreed to his claims. *Id.* at ¶ 120.  In the Australian court filings, Craig apparently falsely identified himself as the "legal agent and representative for the defendant" and its "Director/Australian Agent."  *Id.*  Further, he falsely identified his Australian address and email as the "address for service" for W&K.  *Id.*  On August 28, 2013, Craig filed proposed consent orders in both cases.  *Id.* at ¶ 121.  These filings represented to the Australian courts that W&K consented to judgment being entered against it through the signature of its "authorised officer . . . J Wilson."  *Id.*  "J Wilson" was actually Craig's employee and was not an authorized officer for W&K.  *Id.*  Although Craig did not have direct or voting interest in W&K, Craig "elected" Wilson as a director during a "shareholder meeting" where only Craig was present.  *Id.* at ¶ 122.  On November 6, 2013, the Supreme Court of New South Wales entered judgments in favor of Craig for both claims (the "Australian Judgments").  *Id.* at ¶ 130.

5

EXHIBIT 3
PAGE 74

### E. The Australian Tax Office Investigation

Sometime after Dave's death, the Australian Tax Office ("ATO") began investigating Craig.  Plaintiffs claim Craig needed to use W&K and Dave's assets to justify tax positions he claimed in Australia.  *Id.* at ¶ 96.  To accomplish this, Craig forged and backdated several contracts to create a fraudulent "paper trail" purporting to show that Dave transferred bitcoins and intellectual property rights belonging to Dave and W&K to Craig.  *Id.* at ¶ 97.

During the course of that investigation, the ATO conducted several meetings with Craig and his counsel in Australia, where Craig allegedly told the ATO officials that he had rightfully taken ownership of Dave's bitcoin upon his death.  *Id.* at ¶¶ 82-84.  During one of these meetings with the ATO, Craig's counsel indicated that W&K's bitcoins had been transferred into trusts located in Seychelles, Singapore, and the United Kingdom.  *Id.* at ¶ 84.

Craig's attorney further represented to the ATO officials that intellectual property that had been acquired by Craig from W&K was "on-supplied to the Craig Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange . . . and so on."  *Id.* at ¶ 131.  Craig then provided the fraudulent contracts to the ATO in an attempt to substantiate his ownership of bitcoins and intellectual property that had originally belonged to Dave and/or W&K.  *Id.* at ¶ 89.

### F. The ATO Contacts the Kleiman Family

On February 11, 2014, the Amended Complaint alleges that with the "ATO closely auditing Craig's activities," Craig grew concerned that the ATO would eventually contact the Kleiman family.  *Id.* at ¶¶ 132-133.  Craig decided to contact the Kleiman family

6

EXHIBIT 3
PAGE 75

before the ATO did.  *Id.* at ¶ 132.  Craig reached out via email to Dave's elderly father.
*Id.* at ¶ 133.  He initially instructed him to save any wallet files found on Dave's computer
and indicated that he would give additional information at a later date.  *Id.*  Craig also
represented that he was not seeking "anything other than to give [Dave's father]
information about [his] son," and that he would help the Estate "recover what Dave
owned."  *Id.*  Ira Kleiman ("Ira"), Dave's brother, took over the correspondence with
Craig.  *Id.* at ¶ 134.

Craig told Ira that he was partners with Dave and no one knew about their
collaboration or W&K.  *Id.* at ¶ 135.  Craig explained to Ira that W&K was involved in
Bitcoin mining and that it was very successful.  *Id.*  Craig revealed that he and Dave were
planning on starting a new company together called "Coin-Exch."  *Id.* at ¶ 136.  Craig
told Ira that the Estate would receive shares in the new company "worth millions."  *Id.*

On March 28, 2014, W&K was reinstated by Craig's agent, Uyen Nguyen
("Uyen").  *Id.* at ¶ 139.  Uyen removed Dave as the registered agent for W&K and listed
herself instead.  *Id.*  She then added herself as manager and secretary and an entity named
"Coin-Exch Pty Ltd" as director.  *Id.*  Although he was in regular contact with them,
Craig concealed the reinstatement of W&K from the Estate.  *Id.* at ¶ 140.

In April of 2014, Ira first learned of the Australian Judgments, when an ATO
auditor sent him some of the Australian court documents.  *Id.* at ¶ 123.  The auditor
provided Ira copies of the allegedly fraudulent documents given to the ATO by Craig.
*Id.* at ¶¶ 123, 141-142.

The ATO provided Ira with three deeds, each titled "IP Deed of
Assignment" and each executed on September 15, 2013.  *Id.* at ¶ 142.  Each of these IP

Deeds of Assignments assigned various intellectual property rights from an Australian company named "DeMorgan Ltd" to three separate Australian entities: Coin-Exch Pty, Ltd., Hotwire Preemptive Intelligence Pty, Ltd., and Cloudcroft Pty, Ltd. *Id.* The deeds described the source and nature of the IP as consisting of "source code, algorithms and patentable materials that have been obtained by Craig . . . through the following unrelated entities . . . [W&K]." *Id.* at ¶ 143.

### G. Ira Confronts Craig

On April 22, 2014, Ira confronted Craig about the documents he had received from the ATO via email. *Id.* at ¶ 144. Ira told Craig that after reviewing the documents sent to him by the ATO, he "felt like there [were] questionable discrepancies in the contracts between [Craig] and W&K such as Dave's signatures, his resignation, transfer of all accountable value." *Id.* Craig responded that his actions were taken "to make sure that the court signed off on what Dave and [he] planned," and Craig then promised Ira that the Estate could be paid what was owed to it. *Id.* at ¶ 145.

On April 25, 2014, Craig sent Ira a chronology of his activities related to W&K and the development of its intellectual property. *Id.* at ¶ 147. In this document, Craig wrote "[t]here is a lot of IP and 'stuff' in the mix. All up, it's around a hundred million dollars' worth. This IP originates in work CSW has been doing for more than 10 years; it originates in things that came from W&K; it has to do with the software acquired. The values and distribution . . . amounts to a third each for Cloudcroft, Hotwire, and Coin exch." *Id.*

Craig's promise to Ira of the multi-million dollar payment never came true. *Id.* at ¶ 149. Craig blamed any delay on the ATO investigation and kept promising Ira he

EXHIBIT 3
PAGE 77

would see value when the investigation closed. *Id.* By October 9, 2015, Craig essentially stopped responding to Ira's attempts to contact him. *Id.* at ¶ 150.

The ATO raided Craig's home in late 2015 and Craig fled Australia for London. *Id.* at ¶ 16. Craig currently serves as Chief Scientist of a UK company called nChain in London. *Id.* at ¶ 158. In 2016, Craig filed dozens of patents related to bitcoin and blockchain technology through nChain. *Id.* To date, neither the Estate nor W&K has received the assets allegedly belonging to them as a result of Dave's early involvement in bitcoin and bitcoin mining. *Id.* at ¶ 159.

The Defendant seeks to dismiss Plaintiffs' Amended Complaint on several grounds, including lack of standing, the failure to bring this action as a derivative suit, *res judicata*, forum non conveniens, the expiration of the applicable statute of limitations, international abstention, lack of personal jurisdiction and the failure to state legally sufficient claims. ECF No. [33].

## II.    LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550

9

EXHIBIT 3
PAGE 78

U.S. at 557 (alteration in original)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. These elements are required to survive a motion brought under Rule 12(b)(6), which requests dismissal for "failure to state a claim upon which relief can be granted."

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (*quoting Iqbal*, 556 U.S. at 682).

## III.  ANALYSIS

As stated *supra*, the Defendant moves to dismiss Plaintiffs' Amended Complaint on several grounds. The Court addresses Defendant's arguments in turn.

### A.  Standing

Defendant argues that only W&K has standing to maintain an action for the recovery of intellectual property created or bitcoins mined after February 2011 because the "amended complaint makes clear that Dave Kleiman's alleged business relationship

EXHIBIT 3
PAGE 79

was conducted through W&K," and thus the Estate itself lacks standing to bring claims relating to these assets created during this time. ECF No. [33], at 12. Secondly, Defendant claims that Plaintiffs lack standing because they failed to adequately allege the existence of a 2008 to 2011 partnership between the Defendant and Dave. *Id.* The Court is unpersuaded by both arguments.

"Standing for Article III purposes requires a plaintiff to provide evidence of an injury in fact, causation and redress[a]bility." *Dermer v. Miami-Dade Cty.*, 599 F.3d 1217, 1220 (11th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Specifically, "[t]o have standing, a plaintiff must show (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to conduct of the defendant; and (3) it is likely, not just merely speculative, that the injury will be redressed by a favorable decision." *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003); *see Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980 (11th Cir. 2005) (same).

Defendant claims that "[n]owhere does Plaintiff allege that Dave Kleiman had a direct, personal partnership with Dr. Wright from February 2011 until his death in April 2013." ECF No. [33], at 12. The Amended Complaint, however, includes allegations that Dave personally partnered with the Defendant (after 2011) to create the assets at issue in this lawsuit. For example, the Amended Complaint alleges that "[f]rom [Dave and Craig's] collaboration in 2008 until Dave's death in 2013, Craig and Dave mined over a million of the initial bitcoins together (*personally and through W&K*). *Id.* at ¶ 65 (emphasis added). The Amended Complaint also alleges that "Dave, in partnership with Craig, created intellectual property *both in his individual capacity and through W&K*."

11

EXHIBIT 3
PAGE 80

*Id.* at ¶¶ 65-66 (emphasis added). Taking these allegations as true, as the Court must do for the purposes of analyzing the Motion to Dismiss, the Court finds that the Estate has sufficiently alleged that it sustained an injury for the loss of intellectual property and bitcoin, created and mined after February 2011, and therefore would have standing to bring claims for these assets.

Defendant also claims that Plaintiffs failed to adequately allege the existence of a partnership between the Defendant and Dave Kleiman. ECF No. [33], at 13. Fla. Stat. § 620.8202(1) states that "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." A party attempting to prove the existence of a partnership has the burden of demonstrating the satisfaction of the elements. *Kislak v. Kreedian*, 95 So. 2d 510, 515 (Fla. 1957). The Court notes that the statutory language does not require that a partnership be reduced to writing.[1]

Consistent with Fla. Stat. § 620.8202(1), the Amended Complaint alleges that "Craig and Dave associated to carry on as co-owners of a business for profit to create Bitcoin, mine bitcoins, and create other block chain intellectual property." ECF No. [24], at ¶ 197. Further, the Defendant is alleged to have expressly admitted to having engaged in this partnership with Dave. *Id.* at ¶ 63. The Amended Complaint also alleges that the Defendant and Dave, starting in 2008 through 2013, partnered together to research and

---

[1] Defendant also argues that because the "alleged oral "partnership" agreement was not reduced to writing [it] is barred by the statute of frauds." ECF No. [33], at 14. Defendant's sole factual support is the fact that the partnership between Dave and the Defendant was alleged to have lasted longer than two years. *Id.* The fact that a partnership lasts longer than one year does not mean that the parties originally "intended and contemplated that performance of the agreement would take longer than one year." *Yates v. Ball*, 132 Fla. 132, 181 So. 341, 344 (1937). Here, after a close review of the Amended Complaint, the Court cannot, as a matter of law, conclude that the terms of the oral partnership agreement, as pled, originally contemplated an agreement to be performed beyond one year.

12

EXHIBIT 3
PAGE 81

complete a paper about bitcoin, and to help get the idea "operational." *Id.* at ¶¶ 55-56. Accordingly, the Court concludes that Plaintiffs have sufficiently alleged a partnership existed between Dave and the Defendant for the purposes of a Motion to Dismiss.

### B. Derivative Suit

Defendant also argues that the Amended Complaint should be dismissed because Plaintiffs' claim should have been brought as a derivative suit. *See* ECF No. [33], at 15. Defendant, however, has not provided the Court with any factual or legal analysis of how this principle may apply to the case at hand. *See Anderson v. Branch Banking & Tr. Co.*, 119 F. Supp. 3d 1328, 1345 (S.D. Fla. 2015) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. [The Court] will not do his research for him.") (citing *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) (Posner, J.)). Accordingly, this argument is denied.

### C. Res Judicata

Next Defendant argues that W&K's claims arising from the Defendant's alleged possession of the intellectual property is barred by the doctrine of res judicata because ownership of the intellectual property was already decided by the Supreme Court of New South Wales. ECF No. [33], at 16. A final judgment or order ***on the merits*** operates as res judicata in a subsequent proceeding between the parties on the same cause of action. *Albrecht v. State*, 444 So.2d 8 (Fla. 1984); *O'Brien v. Brickell Townhouse, Inc.*, 439 So. 2d 982 (Fla. 3d DCA 1983); *Sanchez v. Martin*, 416 So. 2d 15 (Fla. 3d DCA 1982). The doctrine of collateral estoppel, or issue preclusion, like res judicata, requires the existence

13

EXHIBIT 3
PAGE 82

of a "final judgment on the merits" as a necessary element. *Papa John's International, Inc. v. Cosentino*, 916 So. 2d 977 (Fla. 4th DCA 2005).

Here, the prior judgments at issue and that form the basis of Defendant's *res judicata* defense are the Australian Judgments. The Australian Judgments were rendered subsequent to the Defendant's filing of the two consent orders in the two Australian lawsuits. ECF No. [24], at ¶ 121. These filings, which are alleged to have been submitted without authorization, represented to the Australian courts that W&K consented to the judgment being entered against it. *Id.* Plaintiffs have attached the "record of proceedings" for both of the Australian lawsuits to its Amended Complaint. ECF No. [24-22]. From a review of the record of proceedings the Court cannot readily determine what issues were decided by the Supreme Court of New South Wales in rendering the Australian Judgments. A court may not dismiss a claim on res judicata grounds where it is not apparent from the face of the order that it was issued as a final judgment on the merits of the case. *See Papa John's International, Inc. v. Cosentino*, 916 So. 2d 977, 984 (Fla. 4th DCA 2005) (finding that the circuit court erred in dismissing a plaintiff's claims where pleading did not demonstrate on its face that a consent order issued in a prior case was a final judgment on the merits of the claims). Here, the "record of proceedings" state only that money judgments have been entered in "favour of [Craig Wright]," and further noting "the agreement of the parties that [Craig Wright] will accept transfer of the intellectual property held by the plaintiff in full satisfaction of the judgment." ECF No. [24-22], at 4-5, 8. Ambiguity of a record that there was a final judgment on the merits covering a party's claims precludes dismissal on res judicata grounds. *See generally*, *Papa John's International, Inc.*, 916 So. 2d at 984. Here,

14

EXHIBIT 3
PAGE 83

Defendant's argument for dismissal on res judicata grounds must fail because it is not clear from a review of the record that the Australian Judgments were decided by the Australian court on the merits of the case. In order for a court to dismiss a party's claims on the grounds of res judicata, the necessary element of a "final judgment on the merits" must be met.

Additionally, the Florida Supreme Court has held that res judicata does not apply when its application would defeat the ends of justice. *deCancino v. E. Airlines, Inc.*, 283 So. 2d 97, 98 (Fla. 1973) ("the doctrine will not be invoked where it will work an injustice."). Here, the Plaintiffs assert, and the Defendant allegedly admitted, that the Australian lawsuits were initiated by the Defendant in an attempt to "make sure the court signed off on what Dave and [Craig] planned." ECF Nos. [24]. at ¶ 123, [24-20], at 18. The Plaintiffs also contend that they were never served with process that these suits were underway. *Id.* at ¶ 119. In light of these facts, it would be an injustice to the Plaintiffs to allow the doctrine of res judicata to be invoked. Accordingly, the Court declines to dismiss Plaintiffs' claims on res judicata grounds.

### D. *Forum Non Conveniens*

Defendant argues that in the event the Court finds that the Plaintiffs have standing and that their claims are not barred by the doctrine of res judicata, dismissal would still be required on forum non conveniens grounds. The doctrine of forum non conveniens permits a court to decline to exercise jurisdiction when the convenience of the parties and the interests of justice weigh in favor of trying the action in an alternative forum. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S. Ct. 252, 70 L.Ed.2d 419 (1981). Analytically, the court's examination is three-pronged. *Id.* When moving to dismiss a

15

EXHIBIT 3
PAGE 84

case on forum non conveniens grounds, the movant must show: (1) the availability of an alternative and adequate forum; (2) that public and private factors weigh in favor of dismissal; and (3) that the plaintiff can reinstate his suit in the alternative forum. *See Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001).

The Supreme Court has "characterized forum non conveniens as essentially, 'a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined.'" *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994)). "The doctrine of forum non conveniens permits a court with venue to decline to exercise its jurisdiction when the parties' and court's own convenience, as well as the relevant public and private interests, indicate that the action should be tried in a different forum." *Pierre-Louis v. Newvac Corp.*, 584 F.3d 1052, 1056 (11th Cir. 2009). "This tool 'is to be favored' for ensuring that federal courts only hear 'those cases where contacts with the American forum predominate.'" *Aldana v. Fresh Del Monte Produce, Inc.*, No. 01-3399-CIV, 2007 WL 3054986, at *3 (S.D. Fla. Oct. 16, 2007), *aff'd sub nom, Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283 (11th Cir. 2009) (quoting *Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512, 1519 n.10 (11th Cir. 1985)).

The defendant invoking forum non conveniens "bears a heavy burden in opposing the plaintiff's chosen forum." *Sinochem Int'l Co. Ltd.*, 549 U.S. at 430. In fact, at the outset, the scale tips in favor of a plaintiff's chosen forum when the plaintiff is a domestic citizen. *Duha v. Agrium, Inc.*, 448 F.3d 867, 874–75 (6th Cir. 2006). There is a strong presumption by the Supreme Court that forum non conveniens should only be employed

in "exceptional circumstances" and that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). The general rule, therefore, is that dismissal for forum non conveniens is proper only when a defendant "establish[es] such oppressiveness and vexation . . . as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947). To the extent that courts consider matters outside the complaint, courts must "draw all reasonable inference and factual conflicts in favor of the plaintiff." *OOO-RM Invest v. Net Element Int'l, Inc.*, No. 14-20903-CIV, 2014 WL 12613283, at *2–3 (S.D. Fla. Nov. 3, 2014) (citing *Webster v. Royal Caribbean Cruises, Ltd.*, 124 F. Supp. 2d 1317, 1320 (S.D. Fla. 2000) and *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004)).

### i. Availability and Adequacy of an Alternative Forum

"Availability and adequacy warrant separate consideration." *Leon v. Million Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001). Ordinarily, an alternative forum is available simply "when the defendant is amenable to process in the other jurisdiction." *Piper*, 454 U.S. at 255 n.22 (internal citation omitted). If the remedy offered in the other forum is unsatisfactory, this requirement may not be satisfied. *See Id.* "[T]he Supreme Court has instructed us that a remedy is inadequate when it amounts to 'no remedy at all.'" *Aldana*, 578 F.3d at 1290 (quoting *Piper*, 454 U.S. at 254).

Defendant's sworn declarations of Gordon Grieve ("Grieve"),[2] a lawyer admitted to practice in Australia, state that claims raised by Plaintiffs in the Amended Complaint

---

[2] The declarations of Gordon Grieve, ECF No. [33-1] and [33-2], are appropriately considered when determining a motion to dismiss based on the doctrine of forum non conveniens. *Ochoa v.*

EXHIBIT 3
PAGE 86

may be filed in Australia if they are dismissed by this Court. *See* ECF No. [33-2], at ¶ 5. The Defendant also filed an affidavit in which he affirmed that he was amenable to service of process for litigation in New South Wales. ECF No. [33-3], at ¶ 23. Because the Court finds that Defendant is susceptible to suit in Australia, the "availability" prong is satisfied. *See Aldana,* 578 F.3d at 1290 ("In order to be available, the foreign court must be able to assert jurisdiction over the litigation sought to be transferred."). The "adequacy" consideration is similarly satisfied because all of Plaintiffs' claims are cognizable under Australian law. *See* ECF No. [33-2], at ¶ 5. Even when an alternate forum is available, however, the defendant still maintains a heavy burden in demonstrating the offsetting disadvantage to litigating in the plaintiff's chosen forum.

### ii. Private Interest Factors

Once an adequate alternative forum has been established, the Supreme Court has directed district courts to consider the "private interest of the litigant." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S. Ct. 839, 91 L.Ed. 1055 (1947). If the court finds that private factors favor dismissal, the Court then determines whether or not factors of public interest tip the balance in favor of a trial in a foreign forum. *La Seguridad v. Transytur Line,* 707 F.2d 1304, 1307 (11th Cir. 1983). The private interest factors a court may consider in its forum non conveniens analysis include (1) ease of access to sources of proof and evidence; (2) availability and costs of obtaining willing and unwilling witnesses, and (3) "all other practical problems that make trial of the case easy, expeditious and inexpensive." *Id.* When plaintiffs are "citizens, residents, or corporations

---

*Empresas ICA, S.A.B. de C.V.*, Case No. 11-CIV-23898, 2013 WL 5674697 at *4 (S.D. Fla. Oct. 17, 2013) (relying on sworn declarations attached to a motion to dismiss of foreign attorneys in forum non conveniens analysis). Plaintiff has not filed any expert declaration opining on foreign law in opposition to Defendant's Motion.

EXHIBIT 3
PAGE 87

of this country," the Eleventh Circuit mandates that a district court "'require positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion as may exist to deny a United States citizen access to the courts of this country.'" *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101–02 (11th Cir. 2004); *see also La Seguridad*, 707 F.2d at 1308 n.7.

The deference given to a plaintiff's choice of forum is especially strong in the Eleventh Circuit. Here, both Plaintiffs are residents of Florida and citizens of the United States. Therefore this Court gives Plaintiffs' choice of forum a high level of deference and presumption of convenience. *See TNT USA, Inc. v. TrafiExpress, S.A. de C.V.*, 434 F. Supp. 2d 1322, 1333 (S.D. Fla. 2006). Defendant claims that several factors weigh in favor of dismissal on forum non conveniens grounds, including the fact that Defendant's alleged conduct took place in Australia, that a number of witnesses may be in Australia (or abroad), and that Australian law may have to be analyzed. Additionally, the Defendant argues that "this Court could not properly adjudicate any of [Plaintiffs'] claims without disregarding, disrespecting, and undermining the Australian court that rendered the Australian Judgments," and that this factor weighs heavily in favor of dismissal. ECF No. [33], at 24.

As an initial matter, the Defendant is correct that this Court cannot invalidate or void the Australian Judgments, as it is without authority to do so. And the Defendant is also correct that the appropriate forum to address fraud on the court, would be the court in which the Plaintiffs claim the fraud was to have occurred. *Tr. Int'l Corp. v. Nagy*, No. 15-80253-CIV, 2017 WL 5248425, at *6 (S.D. Fla. Mar. 28, 2017) (finding that if a

19

EXHIBIT 3
PAGE 88

defendant has used a foreign legal system in some way "which was not above board," then the foreign forum was the correct place to address this concern.).  However, Plaintiffs have asserted that the Australian judgments, if valid, only transferred title to some of the intellectual property at issue in this case.  ECF No. [50], at 30.  Therefore, even if this Court found that the Australian Judgments somehow barred some of the Plaintiffs' claims the "maximum preclusive effect would only bar Plaintiffs claims to W&K's intellectual property, leaving the overwhelming majority of Plaintiffs' claims. . . pending before this Court." *Id.*  To the extent that independent claims exist, there is no reason why this forum would not be the proper forum to adjudicate them.  Moreover, while this Court does not have authority to invalidate the Australian Judgments, it can make a factual finding as to whether the contractual agreements used by the Defendant in procuring the Australian Judgments were fraudulent. Therefore, this Court finds that the existence of the Australian Judgments is not an "unusual and extreme factor" warranting dismissal on forum non conveniens grounds. *La Seguridad*, 707 F.2d at 1308 n.7.

The Court continues its forum non conveniens analysis by considering whether sources of proof are accessed with relative ease in Plaintiffs' chosen forum, "[p]erhaps the most important 'private interest' of the litigants is access to evidence." *Ford v. Brown*, 319 F.3d 1302, 1308 (11th Cir. 2003).  The ease of access to sources of evidence in this case is another factor weighing in the Plaintiffs' favor.  The Defendant claims that the majority of evidence relevant to this action is located abroad.  The Plaintiffs, however, argue that the "majority of the witnesses and evidence necessary to prove the factual issues "at the core of Plaintiff's claims," are located in Florida and the United States."  ECF No. [50], at 19.

EXHIBIT 3
PAGE 89

In their opposition to Defendant's Motion, the Plaintiffs identified nine witnesses located in Florida alone and another five witnesses located in the United States that they claim will assist in the establishment of the core facts of their claim. *Id.* at 20. Conversely, the Defendant claims many his witnesses are located in Australia or abroad.[3] ECF No. [33], at 22-23. Nonetheless, the presence of witnesses outside of the United States is insufficient to overcome the strong presumption afforded to domestic plaintiffs. *Ward v. Kerzner International Hotels Ltd.,* 2005 WL 2456191 at *3 (S.D. Fla. Mar. 30, 2005); *Aldana,* 578 F.3d at 1293; *Esfeld v. Costa Crociere, S.P.A.,* 289 F.3d 1300, 1303 (11th Cir.2002)("[F]ederal courts, in the forum non conveniens context, do not focus on the connection between the case and a particular state, but rather on the connection of the case to the United States as a whole.").

Additionally, Defendant argues that the relevant witnesses and evidence related to this case are located in Australia and/or are confidential and protected from disclosure under Australian law, and thus not subject to the compulsory process of this forum. ECF No. [33], at 23. Plaintiffs claim that much of the evidence the Defendant has identified as foreign "can be displayed and printed from a computer with an Internet connection . . . [or] are in [Defendant's] own records, his agent's records, or are records he can easily obtain or view in Florida." ECF No. [50], at 24. These documents include the documents from the ATO investigation, the Australian court filings, and documents in the possession of the Defendant and/or his Australian companies. The Court agrees with the Plaintiffs that much of this evidence that the Defendant asserts is beyond the compulsory process of this Court, is under the direct control of the Defendant. The Defendant does

---

[3] Not even the Defendant himself is located in Australia, as he has since relocated to the United Kingdom. ECF No. [24], at ¶ 3. The Court notes that the United Kingdom is in closer proximity to the United States than to Australia.

EXHIBIT 3
PAGE 90

not need compulsory process to compel the testimony of his own agents or employees. *Wagner*, 984 F. Supp. 2d at 1315 (foreign witnesses insufficient to overcome strong presumption because they were "at least arguably associated with or employees of [defendant]"); *Ward*, 2005 WL 2456191, at *1 (foreign witnesses insufficient to override strong presumption because they were defendant's "own agents and employees"); *TNT USA Inc.*, 434 F. Supp. 2d at 1334 (no dismissal because foreign witnesses are "under the control" of defendant); *Doe v. Sun Int'l Hotels, Ltd.*, 20 F. Supp. 2d 1328, 1330 (S.D. Fla. 1998) (no dismissal because "key defense witnesses are employees of the defendant").

Further, in today's advanced technological age the exchange of electronically stored evidence is not unduly burdensome, and the Court is confident that much of the evidence identified as foreign "can be displayed and printed from a computer with an Internet connection." *TNT USA*, 434 F. Supp. 2d at 1334; *see also City Pension Fund for Firefighters and Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1411 (S. D. Fla. 2011) (dismissal denied because "[a]lthough the majority of proof may be located in Brazil, many of the documents and records are likely electronically stored and can easily be transferred.").

This Court finds that the Defendant has not satisfied his burden of setting forth "positive evidence of unusually extreme circumstances" sufficient to overcome the strong presumption in favor of Plaintiffs' choice of forum. *Ward,* 2005 WL 2456191, at *4. Defendant fails to provide arguments that "material injustice is manifest" such that the Court should be compelled to deny the Plaintiffs their access to United States courts. The Court therefore finds that the private interest factors weigh against granting dismissal on the grounds of forum non conveniens.

EXHIBIT 3
PAGE 91

CASE No. 18-cv-80176-BLOOM/Valle

### iii.    Public Interest Factors

In the Eleventh Circuit, "[a] trial court will look at the private interests first and then, if the balance of the private interests are found 'to be in equipoise or near equipoise,' it will 'determine whether or not factors of public interest tip the balance in favor of a trial in a foreign forum.'" *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1382 (11th Cir. 2009) (quoting *La Seguridad*, 707 F.2d at 1307).  This Court has concluded that the private interest factors do not align in favor of Defendant's position for dismissal on forum non conveniens grounds and are thus not in equipoise.  Nonetheless, the public interest factors also weigh against dismissal. The Supreme Court has advised that the public factors for this Court's consideration are:

> [T]he administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft Co.*, 454 U.S. at 241 n.6 (internal quotations omitted).

Further, in *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, the Eleventh Circuit Court of Appeals made clear that the "United States has a strong interest in providing a forum for its citizens' grievances against an allegedly predatory foreign business." *Id.*  It is also worth noting that "although the Southern District of Florida has one of the busiest dockets in the United States" this factor should be accorded little or no weight in the analysis. *Morse v. Sun In'l Hotels Ltd.,* 2001 WL 34874967, at *6 (S.D. Fla. Feb. 26, 2001).

23

EXHIBIT 3
PAGE 92

Additionally, it is clear that the instant action is in key respects a localized Florida controversy.  This Court emphasizes that the federal interest is "very strong . . . [when] its citizens are allegedly victims and the injury occurs on home soil."  *SME Racks,* 382 F.3d at 1104. This controversy concerns a Florida company, regarding Florida assets (bitcoins mined in Florida) and intellectual property developed by that Florida company, where both the injured parties are Florida citizens.  Therefore, the Southern District of Florida undeniably has a strong interest in adjudicating a case in which its residents claim that harm was committed against them.

Additionally, Defendant argues that in allowing this case to proceed, the Court would be required to apply Australian law because the Amended Complaint relies on "Australian legal documents," and because certain contracts at issue "contain the parties' agreement to submit any dispute to the jurisdiction of the courts of New South Wales, Australia."  ECF No. [33], at 21-22.  Even if foreign law were to play a role in interpreting the contract provisions at issue, this alone is not enough to defeat the Plaintiffs ability to litigate the case here in the United States.  *TNT USA, Inc v. TrafiExpress, S.A. de C.V.*, 434 F. Supp. 2d 1322, 1335 (S.D. Fla. 2006) (finding that foreign contractual provisions could be properly adjudicated within the American forum, and that the interpretation of  foreign law within the contract provisions alone was not enough to take away the plaintiff's ability to litigate in its choice forum); *see also SME Racks, Inc.,* 382 F.3d at 1104–05 (finding that "while the application of foreign law is an important factor to be considered in weighing the public interests, this factor cannot be accorded dispositive weight."); *Burt v. Isthmus Development Co.,* 218 F.2d 353, 358 (5th Cir.1955) (finding the need to apply foreign law to decide a controversy does not amount

EXHIBIT 3
PAGE 93

to a sound reason to dismiss the case).  Accordingly, this Court finds that the public interest factors do not direct dismissal of this case.  The Defendant has not met his heavy burden of opposing Plaintiffs, and dismissal on forum non conveniens grounds is therefore not warranted.

### E.  International Abstention

Defendant also argues that dismissal is required in application of the international abstention doctrine.  In general, federal courts have an obligation to exercise the jurisdiction conferred upon them. *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S. Ct. 1236, 1246, 47 L.Ed.2d 483 (1976).  However, abstention from the exercise of jurisdiction is appropriate in some private international disputes. *Turner Entertainment Co. v. Degeto Film GmbH,* 25 F.3d 1512, 1518 (11th Cir. 1994).  Abstention is the exception instead of the rule, and "courts regularly permit parallel proceedings in an American court and a foreign court." *Ortega Trujillo v. Conover & Co. Commc'ns*, 221 F.3d 1262, 1265 (11th Cir. 2000).  The doctrine of *international abstention* enables courts to abstain and stay proceedings in this country in favor of litigation proceeding elsewhere. In examining whether abstention is appropriate, courts must consider issues of international comity, fairness to litigants, and the efficient use of scarce judicial resources. *See Turner Entm't Co. v. Degeto Film GmbH,* 25 F.3d 1512, 1518 (11th Cir. 1994). International comity "is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209, 1223 n. 25 (11th

EXHIBIT 3
PAGE 94

Cir.1999) (quoting *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895)).  In considering the fairness to litigants, the court should consider the order in which the suits were filed, the more convenient forum, the possibility of prejudice resulting from abstention, and the risk of inconsistent judgments.  *See Turner,* 25 F.3d at 1521–22; *Posner,* 178 F.3d at 1224.  Finally, with regard to the efficient use of scarce resources, courts must consider the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, whether the actions have common parties and issues, and whether the alternative forum is likely to render a prompt resolution. *Turner,* 25 F.3d at 1522.

The Court finds that the Amended Complaint should not be dismissed based on the doctrine of international abstention.  First, principles of international comity do not favor abstention.  This case is distinct from the proceedings brought in Australia, as those proceedings did not address any of the tort claims brought by the Plaintiffs in the instant action and Plaintiffs have alleged the Australian Judgments do not even begin to cover all of the assets and property sought in the Amended Complaint. ECF No. [50], at 34 (The Australian Judgments "maximum preclusive effect would only bar Plaintiffs claims to W&K's intellectual property, leaving the overwhelming majority of Plaintiffs' claims."). With regard to fairness to litigants, this factor also does not favor abstention. While the Australian lawsuits were undoubtedly filed first, Plaintiffs allege that the Defendant failed to serve the Plaintiffs or provide adequate notice that the lawsuits were underway. ECF No. [24], at ¶ 119.  Moreover, as discussed *supra,* the United States is the more convenient forum to adjudicate Plaintiffs' claims.  Finally, the Court does not believe the efficient use of judicial resources compels abstention. The proceedings in Australia were

EXHIBIT 3
PAGE 95

ministerial in nature, in that they were never contested by W&K and were rendered as a result of consent judgments. Further, it is not readily apparent that the Supreme Court of New South Wales adjudicated the claims on the merits. Lastly, since the Australian lawsuits are currently closed, there is presently no parallel case to which this Court would abstain. In essence, the resolution of the instant matter will not result in piecemeal litigation or otherwise waste judicial resources. Accordingly, the Court rejects the argument that the Amended Complaint should be dismissed based upon the doctrine of international abstention.

### F. Personal Jurisdiction

Defendant also argues that the Amended Complaint does not properly assert personal jurisdiction over the Defendant. He contends that the Plaintiffs have failed to establish personal jurisdiction under Fla. Stat. § 48.193(1)(a)(1-2), as the Amended Complaint fails to show that the Defendant committed the wrongful acts in the course of "[o]perating, conducting, engaging in, or carrying on a business" or "committed tortious acts" while physically in the state of Florida or in the United States. ECF No. [33], at 34.

Physical presence in the forum state is not required to establish personal jurisdiction under Fla. Stat. 48.193(a)(1-2). *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002); *see also Canadian Steel, Inc. v. HFP Capital Markets, LLC*, No. 11-23650-CIV, 2012 WL 2326119, at *4 (S.D. Fla. June 19, 2012) (following the "clear weight of binding Eleventh Circuit authority on this question" and holding plaintiffs' established personal jurisdiction under 1(a)(2) solely "on the basis of its allegations that it suffered injury in Florida from Defendants' intentional torts."). Indeed, the Eleventh Circuit has held that a court may assert jurisdiction over a "nonresident defendant who commits a

27

EXHIBIT 3
PAGE 96

tort outside of the state that causes injury inside the state." *Brennan v. Roman Catholic Diocese of Syracuse New York, Inc.*, 322 F. App'x 852, 855 (11th Cir. 2009) (citing *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217 (11th Cir. 1999)). Thus when an out-of-state defendant commits an intentional tort against a Florida citizen, as the Plaintiffs have alleged occurred in the instant matter, the defendant has caused the necessary Florida injury and is subject to jurisdiction here. Therefore, the Court finds that Plaintiffs have alleged a prima facie case for jurisdiction over Defendant pursuant to Fla. Stat. § 48.193(1-2), based on the allegations of the Amended Complaint. In so finding, the Court follows the clear weight of binding Eleventh Circuit authority on this question. In particular, the Court is bound by the Eleventh Circuit's pronouncement in *Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008), that § 48.193(1)(b) of the Florida long-arm statute permits jurisdiction over an out-of-state defendant who commits an out-of-state tort, so long as that tort caused an injury in Florida. *See* 544 F.3d at 1283 (citing *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1216 (11th Cir.1999)).

### G. Statute of Limitations

Defendant further moves to dismiss all of Plaintiffs' claims arguing that they are barred by the applicable statute of limitations. Defendant asserts that a four-year statute of limitations applies to Plaintiffs' claims for conversion (Count I), Unjust Enrichment (Count II), breach of fiduciary duty (Count V), breach of partnership duties and loyalty of care (Count VI), fraud (Count VII), constructive fraud (VIII), and permanent injunction (IX). ECF [33], at 36. Concerning Plaintiffs' misappropriation claims (Counts III and IV), Defendant asserts that a three-year statute of limitations applies. *Id.* "Generally, whether a claim is barred by the statute of limitations should be raised as an affirmative

EXHIBIT 3
PAGE 97

defense in the answer rather than in a motion to dismiss . . . However, if facts on the face of the pleadings show that the statute of limitations bars the action, the defense can be raised by motion to dismiss." *Spadaro v. City of Miramar*, 855 F. Supp. 2d 1317, 1328 (S.D. Fla. 2012) (citing Cabral v. City of Miami Beach, 76 So.3d 324, 326 (Fla. 3d DCA 2011)); *see also Keira v. U.S. Postal Inspection Serv.*, 157 Fed.Appx. 135, 136 (11th Cir. 2005) ("At the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute.") (internal quotation marks and citation omitted). "A statute of limitations bar is an affirmative defense, and plaintiffs are not required to negate an affirmative defense in their complaint." *La Grasta v. First Union Securities, Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (internal citations and quotations omitted). "[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time barred." *Id.*

Concerning Plaintiffs' claims to which the four-year statute of limitations applies (Counts I, II, V, VI, VII, VIII and IX), Defendant claims that the last act establishing these causes of action occurred when Dave Kleiman died or, at the latest, by November 2013, when the Defendant obtained the Australian Judgments. *Id.* at 37. In their Opposition, Plaintiffs argue that the Defendant has identified the incorrect accrual dates, that issues of fact predominate the accrual of Plaintiffs' claims, and that the relevant Florida authority permits the tolling of the statute of limitations. ECF No. [50], at 43. The Court agrees that the wrong accrual date related to these claims has been identified by the Defendant and that Plaintiffs have alleged facts sufficient to demonstrate that

29

EXHIBIT 3
PAGE 98

under the doctrine of fraudulent concealment, the statute of limitations could have been tolled.

Florida law permits the tolling of a statute of limitations "when a plaintiff alleges fraudulent concealment." *Razor Capital, LLC v. CMAX Fin. LLC*, 17-80388-CIV, 2017 WL 3481761, at *4 (S.D. Fla. Aug. 14, 2017); *see also Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1282 n.1 (11th Cir. 2003) ("Fraudulent concealment requires the defendants to engage in the willful concealment of the cause of action using fraudulent means to achieve that concealment.") (citing *Berisford v. Jack Eckerd Corp.*, 667 So. 2d 809, 811-12 (Fla. 4th DCA 1995)); *Nardone v. Reynolds*, 333 So. 2d 25, 39 (Fla. 1976) ("[T]he statute of limitations will be tolled when it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him for discovering his injury."); *Vargas By & Through Vargas v. Glades General Hosp.*, 566 So. 2d 282, 285 (Fla. 4th DCA 1990) ("[T]he courts will not protect defendants who are directly responsible for the delays of filing because of their own willful acts; it is a doctrine to prevent the court from participating in the fraud of the defendant.").  To show fraudulent concealment, a plaintiff must show "(1) successful concealment of the cause of action; (2) fraudulent means to achieve that concealment and (3) that the plaintiff exercised reasonable care and diligence in seeking to discover the facts that form the basis of the claim." *Razor Capital*, 2017 WL 3481761 at *4. "[W]hether or not fraudulent concealment is sufficient to toll the statute of limitations is a question of fact." *Id.* (citing *Walker v. Dunne*, 368 So. 2d 640, 641 (Fla. 2nd DCA 1979)).

EXHIBIT 3
PAGE 99

Here, Plaintiffs have alleged that the Defendant engaged in a fraudulent scheme to take control of assets belonging to the Estate and W&K by initiating lawsuits in Australia without giving any of the Plaintiffs notice that the suits were underway. In order to procure the Plaintiffs' property, the Plaintiffs claim that the Defendant forged several contracts to make it seem like Dave had willingly given the Defendant W&K's intellectual property and bitcoins. ECF No. [24], at ¶ 97. Plaintiffs assert that they only became aware of the facts that give rise to the claims asserts in Counts (Counts I, II, V, VI, VII, VIII and IX) in April 2014. *Id.* at ¶ 123. Further, when the Defendant was confronted by Ira about the Australian Judgments, Defendant admitted that he had taken such actions because "Dave died" and he wanted to "make sure that the court signed off on what [they had] planned. *Id.* Because the Court is required to assume all factual allegations as true, this is the time when the statute of limitations begins to run. As such, these claims were timely brought within the four-year period, and were not barred by the statute of limitations. If, during discovery, it becomes apparent that Plaintiffs became aware of the Defendant's conduct more than four years before the filing of the instant action, Defendant may raise the statute of limitations issue again in a motion for summary judgment. *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1293–94 (S.D. Fla. 2001).

Turning to the Plaintiffs' misappropriation claims (Count III and IV), section 688.007 of the Florida Statutes provides that "[a]n action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Fla. Stat. § 688.007. A proceeding under 18 U.S.C. §1836 must be commenced within 3 years after the date on which the

EXHIBIT 3
PAGE 100

misappropriation is discovered or should have been discovered. *See* 18 U.S.C. §1836 (b)(3)(d). Dismissal on statute of limitations grounds is appropriate only if it is "apparent from the face of the complaint" that the claim is time-barred. *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

The Court has carefully reviewed the Amended Complaint, and finds that the Plaintiffs' misappropriation claims are barred by the three-year statute of limitations based on the facts as alleged on the face of the Amended Complaint. The instant action was filed on February 14, 2018. ECF No. [1]. The Amended Complaint directly states that Plaintiffs became aware of the Australian Judgments when an ATO auditor contacted Ira Kleiman on April 15, 2014 – which is well beyond the three-year statute of limitations period for Plaintiffs misappropriation claims. ECF No. [24], at ¶¶ 123, 141-143. The Amended Complaint alleges that on April 22, 2014, Ira confronted the Defendant via email and stated that he "felt like there [were] questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value . . . ." *Id.* at 144; ECF No. [24-24], at 20. Counts III and IV of the Amended Complaint relate directly to the trade secrets that are identified as "those Craig attempted to have transferred through the fraudulent Australian judgments." ECF No. [24], at 43. Thus, Plaintiffs have affirmatively stated that they were aware of the Defendant's conduct on April 22, 2014, which is the conduct that gives rise to their claims for misappropriation. Even if they did not know the extent of the harm, upon learning of the Defendant's conduct from the ATO auditor, the Plaintiffs should have discovered the Defendant's misapplication of the trade secrets through the "exercise of reasonable diligence."

EXHIBIT 3
PAGE 101

In light of the fact that the Court can determine from the face of the Amended Complaint that the statute of limitations has run, Plaintiffs' claims for misappropriation in Count III and IV are dismissed. *See Caplen v. Guardian Life Ins. Co. of Am.,* 1996 WL 1057652 *4, No. 96–8359–CIV (S.D. Fla. Oct. 22, 1996) (stating that statute of limitations may be raised on motion to dismiss only if court can determine from face of complaint that limitations period has run).

### H. Failure to State Sustainable Claims

In his final argument for the dismissal of the Amended Complaint, the Defendant claims that the Amended Complaint fails to state "sustainable claims." ECF No. [33], at 40. Defendant claims that "the amended complaint does not allege a coherent or justiciable basis for relief" and instead "tells a tall tale," which is "far-fetched and apparently fabricated as a Rube Goldberg contraption." *Id.*

In reviewing a "Rule 12(b)(6) [motion] for failure to state a claim, [courts] accept[] the factual allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiffs." *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1169 (11th Cir. 2014). Accordingly, at this stage, the Court construes the facts alleged in the light most favorable to the Plaintiffs and disagrees with the Defendant that the Amended Complaint is "implausible" on its face.

The Defendant also argues that Plaintiffs have failed to adequately allege a claim for conversion (Count I) of the bitcoins at issue in this case, because as a form of money the Plaintiffs failed "to allege that any of the purported bitcoins were specifically identifiable or that Dave Kleiman had exclusive ownership of any identifiable bitcoins." ECF No. [33], at 49. Plaintiffs argue that bitcoin is not "money" but rather a commodity,

EXHIBIT 3
PAGE 102

and regardless of whether it is money, they have identified the bitcoin with sufficient specificity. ECF No. [50], at 51.

Florida law defines the tort of conversion as "the wrongful exercise of dominion or control over property to the detriment of the rights of one entitled to possession." *United States v. Bailey*, 288 F. Supp. 2d 1261, 1269 (M.D. Fla. 2003) aff'd, 419 F.3d 1208 (11th Cir. 2005) (citing *Bel-Bel Int'l Corp. v. Cmty. Bank of Homestead*, 162 F.3d 1101, 1108 (11th Cir. 1998)); *see Deutsche Bank Nat. Trust Co. v. Foxx*, 971 F. Supp. 2d 1106, 1119 (M.D. Fla. 2013) ("Conversion is an unauthorized act that deprives a person of his property permanently or for an indefinite time"). To establish a claim for conversion of money under Florida law, a claimant must demonstrate: (1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so. *Bailey*, 288 F. Supp. 2d at 1264 (citing *Navid v. Uiterwyk Corp.*, 130 B.R. 594, 595-596 (M.D. Fla. 1991)).  An action for conversion of money consists of three elements: specific and identifiable money, a deprivation of money belonging to another, and an unauthorized act, which deprives another of his money. *Navid*, 130 B.R. at 595 (M.D. Fla. 1991).

The Eleventh Circuit Court of Appeals has yet to decide whether bitcoin is considered "money" for the purposes of a claim of conversion in a civil context.  As cited by the Defendant, however, courts in other districts have held that bitcoin qualified as money for the purposes of indicting and prosecuting a defendant on federal money laundering statutes.  *See e.g., United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014); *see also SEC v. Shavers,* 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) ("It is

clear that Bitcoin can be used as money. It can be used to purchase goods or services.... [I]t can also be exchanged for conventional currencies....").  Plaintiffs argue that even if "the specificity requirement for conversion of money claims applies, the [Amended Complaint] sufficiently identifies the bitcoins Plaintiffs owned."  *See* ECF No. [50], at 48.  The Court agrees with the Plaintiffs.

Whether or not bitcoin is "money" for the purposes of a conversion claim, the Court agrees with the Plaintiffs that they have sufficiently (and with specificity) alleged a claim for conversion.  In regards to the bitcoin's specificity and identity, Plaintiffs have alleged that the bitcoin blockchain is "a giant ledger that tracks the ownership and transfer of every bitcoin in existence and that every bitcoin wallet and the number of bitcoin inside that particular wallet can be identified on the blockchain by referring to its "public key."  ECF No. [24], at ¶¶ 20-21.  Further Plaintiffs claim that the bitcoin at issue were "stored in specifically identifiable bitcoin wallets."  *Id.* at ¶ 65. Defendant also argues that Plaintiffs have failed to "allege exactly how many bitcoins Dave Kleiman supposedly owned at any time in the past."  ECF No. [33], at 48.  Plaintiffs, however, have directly alleged that Defendant admitted that Dave owned at "least 300,000 of the 1,000,000+ bitcoins allegedly held in trust."  ECF No. [24], at ¶ 88.  The Plaintiffs have also alleged that the bitcoins were transferred to trusts located in "Seychelles, Singapore, and [the] UK."  ECF No. [33], at ¶ 84.

Here, the Court finds that Plaintiffs have sufficiently alleged a claim for conversion. The Amended Complaint alleges that Defendant converted at least 300,000 bitcoins upon Dave's death and transferred them to various international trusts, which

EXHIBIT 3
PAGE 104

Case 9:18-cv-80176-BB Document 68-1 Entered on FLSD Docket 06/07/2018 Page 36 of 39
Case 9:18-cv-00376-BAS-BSC Document 68-1 Filed 06/07/18 Page 36 of 39

CASE No. 18-cv-80176-BLOOM/Valle

was an unauthorized act that deprived the Plaintiffs of the bitcoins therein.  Accordingly, Plaintiffs' claim for conversion (Count I) survives Defendant's Motion to Dismiss.

Lastly, Defendant argues that Plaintiffs failed to adequately allege a claim for constructive fraud because the Plaintiffs failed to identify the existence of a fiduciary relationship between the Defendant and Ira Kleiman.  ECF No. [33], at 49-50.  Under Florida law, constructive fraud occurs "when a duty under a confidential or fiduciary relationship has been abused or where an unconscionable advantage has been taken." *Levy v. Levy*, 862 So. 2d 48, 53 (Fla. 3d DCA 2003).  The Florida Supreme Court has stated that the relation and duties involved need not be legal; instead, "they may be moral, social, domestic, or personal."  *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002).  A fiduciary or confidential relationship exists where "confidence is reposed by one party and a trust is accepted by the other, or where confidence has been acquired and abused." *Id.* The origin of the confidence is immaterial. *See Id.* Thus, "[t]he term 'fiduciary or confidential relation' is a very broad one." *Am. Honda Motor Co. v. Motorcycle Info. Network*, Inc., 390 F. Supp. 2d 1170, 1179 (M.D. Fla. 2005) (quoting *Quinn v. Phipps*, 113 So. 419, 420 (Fla. 1927) ).

To state a claim for breach of a fiduciary or confidential relationship, "a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Watkins v. NCNB Nat. Bank of Fla., N.A.*, 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993) (quoting *Bankest Imports, Inc. v. ISCA Corp.*, 717 F. Supp. 1537, 1541 (S.D. Fla. 1989)). "The fact that one party places trust or confidence in the other does not create a confidential relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the

36

EXHIBIT 3
PAGE 105

part of the other party." *Lanz v. Resolution Trust Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991).

The Defendant argues that Plaintiffs have failed to adequately allege a claim for constructive fraud because Plaintiffs failed to "identify the fiduciary relationship that [the Defendant] purportedly breached other than to say that it was a "fiduciary" one, let alone allege that [the Defendant] ever "recognized, accepted, or undertook" any fiduciary duties to Ira Kleiman or W&K after Dave Kleiman died." ECF No. [33], at 50. As an initial matter, as this Court has previously noted, "[u]nless the relationship is formed through an express agreement, whether a fiduciary relationship exists is necessarily fact-specific to a particular case. "Therefore a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)' because it 'is often impossible to say that [a] plaintiff will be unable to prove the existence of a fiduciary relationship.'" *Hansen v. Premier Aviation Holdings, LLC*, No. 17-CV-61025, 2017 WL 8893119, at *4 (S.D. Fla. Nov. 21, 2017) (quoting *Reuss v. Orlando Health, Inc.*, 140 F. Supp. 3d 1299, 1304 (M.D. Fla 2015) (quoting *Childers v. N.Y. Presbyterian Hosp.*, 36 F. Supp. 3d 292, 300 (S.D.N.Y. 2014))).

Additionally, under Florida law, constructive fraud also occurs "where an unconscionable advantage has been taken" of a weaker party. Plaintiffs allege that the Defendant took advantage of a family (the Estate) who was unaware of its deceased's involvement in an invention that is alleged to have revolutionized the world and took control of property and assets that the Estate was unaware existed. Specifically, the Amended Complaint alleges that the Defendant reached out to Dave's elderly father 10-months after his son's passing, representing that he was not "seek[ing] anything other

37

EXHIBIT 3
PAGE 106

than to give [him] information about [his] son," offering to help the Kleiman family recover what Dave owned. ECF No. [24], at ¶ 133. The Amended Complaint further alleges that the Defendant provided the Estate with details and insight on the new company (Coin-Exch.) that the Defendant and Dave had intended to start together, and told the Estate that they would receive shares in the company "worth millions." *Id.* at ¶ 136. The Amended Complaint, also claims that the Defendant made several fraudulent omissions and misrepresentations to the Estate related to the property and assets at issue in this action. *See Id.* at ¶¶ 14, 138-139, 149. At this stage of the pleadings, and accepting Plaintiffs' allegations as true, Plaintiffs have sufficiently asserted a claim for constructive fraud and the Court finds that Count VIII also survives Defendant's Motion to Dismiss.

## IV.    CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion to Dismiss the Amended Complaint, **ECF No. [33]**, is **GRANTED in part and DENIED in part**. Counts III and IV of Plaintiffs' Amended Complaint, **ECF No. [33]**, are **DISMISSED WITH PREJUDICE**.

2. Defendant shall answer Counts I, II, V-IX of the Amended Complaint, ECF No. [24], no later than **January 10, 2019**.

**DONE AND ORDERED** in Miami, Florida, this 27th day of December, 2018.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

38

EXHIBIT 3
PAGE 107

Case 9:18-cv-80176-BB Document 68-1 Entered on FLSD Docket 12/07/2018 Page 39 of 117

CASE No. 18-cv-80176-BLOOM/Valle

Copies to:

Counsel of Record

39

EXHIBIT 3
PAGE 108

# EXHIBIT 4

EXHIBIT 4
PAGE 109

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Ira Kleiman et al.

CIVIL ACTION NO.: 9:18-CV
-80176

**VS**                                                        *Plaintiff*

**Craig Wright**

*Defendant*

# AFFIDAVIT OF SERVICE

State of California }
County of Los Angeles } ss.:

The undersigned, being duly sworn, deposes and says;

Deponent is not a party herein, is over 18 years of age and resides in the state of California,

That on **03/20/2019** at **8:05 PM** at **4908 Calle Robelada, Agoura Hills, CA 91301**

deponent served a(n) **Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action with Schedule A**

on **Joseph VaughnPerling**

by delivering a true copy to said witness personally;

deponent knew the person so served to be the witness described in said subpoena.

Description of Person Served:
Gender: Male
Skin:  White
Hair: Brown
Age: 51 - 69 Yrs.
Height: 5' 9" - 6' 0"
Weight:161-200 Lbs.
Other:

Sworn to before me this

21st day of March, 2019

NOTARY PUBLIC

ANN E. YOST
COMM. # 2177033
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMM. EXPIRES JAN. 5, 2021

Nancy Banfield
License No. 5054
Los Angeles County

Serving By Irving, Inc. | 233 Broadway, Suite 2201 | New York, NY 10279
New York City Dept. of Consumer Affairs License No. 0761160

EXHIBIT 4
PAGE 110

# EXHIBIT 5

EXHIBIT 5
PAGE 111



**VIA CERTIFIED MAIL**

May 23, 2019

Joseph Vaughn Perling
4908 Calle Robleda
Agoura Hills, CA 91301

> **RE:** **Subpoena to Produce Documents in Connection with** *Kleiman v. Wright*,
> **No. 18-cv-80176 (S.D. Fla.)**

Dear Mr. Vaughn Perling:

      I represent the Estate of Dave Kleiman and W&K Info Defense Research LLC in *Kleiman v. Wright*, No. 9:18-cv-80176 (S.D. Fla.), a case in federal court in Florida brought by my clients against Craig Wright. As you know, on March 20, 2019, you were served with a subpoena in connection with that case. That subpoena—which was issued on February 25, 2019, and is attached to this letter—commanded you to produce certain documents by <u>March 27, 2019</u> to the offices of Boies Schiller Flexner LLP, located at 725 S Figueroa Street in Los Angeles, CA 90017.

      At this point, almost two months have passed since the March 27 deadline, and you have neither complied with nor objected to the subpoena. By failing to respond in any way to the subpoena, you have waived any objections you may have had to the subpoena. *See, e.g.*, *McCoy v. Southwest Airlines Co., Inc.*, 211 F.R.D. 381, 384-85 (C.D. Cal. 2002) ("a nonparty's failure to timely make objections to a Rule 45 subpoena duces tecum generally requires the court to find that any objection, including attorney-client privilege, has been waived"). If you do not send us all of the documents in your possession, custody or control that are requested in Schedule A to the subpoena by June 3, 2019, or you do not notify us by that date that you will produce those documents, we will file a motion in the U.S. District Court for the Central District of California requesting that the Court enter an order (1) compelling you to produce the documents requested in the subpoena, and (2) requiring you to show cause as to why you should not be held in contempt for disregarding the subpoena. *See, e.g.*, *Morin v. County of Riverside*, No. ED CV 14-141-GW (SP), 2014 WL 12597117, at *2 (C.D. Cal. Oct. 27, 2014) (ordering person that failed to respond to subpoena to comply with subpoena and "show cause why he should not be held in contempt").

EXHIBIT 5
PAGE 112



Joseph Vaughn Perling
May 23, 2019
Page 2 of 2


        If you would like to resolve this matter informally instead of in court, please email me at mpritt@bsfllp.com or call me at (510) 874-1012 as soon as possible and, in any event, by June 3, 2019.


                                    Sincerely,


                                    _____
                                    Maxwell V. Pritt


                                    Boies Schiller Flexner LLP
                                    1999 Harrison Street, Suite 900
                                    Oakland, CA  96412


Encl.

# EXHIBIT 6

EXHIBIT 6
PAGE 114



EXHIBIT 6
PAGE 115